Opinion issued July 28, 2015



In The

# Court of Appeals

For The

# First District of Texas

———————————

NO. 01-12-00470-CV

———————————

**ENTERGY CORPORATION, ENTERGY SERVICES, INC., ENTERGY POWER, INC., ENTERGY POWER MARKETING CORPORATION, ENTERGY ARKANSAS, INC., AND ENTERGY TEXAS, INC., Appellants**

**V.**

**DAVID JENKINS, GEORGE W. STRONG, FRANCIS N. GANS, AND GARY M. GANS, INDIVIDUALLY AND ON BEHALF OF ALL PERSONS SIMILARLY SITUATED, Appellees**

———————————

**On Appeal from the 344th District Court**
**Chambers County, Texas**
**Trial Court Case No. CV20666**

———————————

## OPINION ON REHEARING

Appellees, David Jenkins, George W. Strong, Francis N. Gans, and Gary M.

Gans, individually and on behalf of all persons similarly situated (collectively,

"Jenkins"), moved for rehearing and en banc reconsideration of our November 6, 2014 opinion. We granted rehearing and withdrew our November 6, 2014 opinion and judgment and the December 30, 2014 dissenting opinion. We now issue this opinion in its stead. Our disposition remains unchanged.

This is an interlocutory appeal challenging the trial court's order certifying a class action in a suit brought under the Texas Theft Liability Act ("the Theft Act").[1] In three issues, appellants, Entergy Corporation, Entergy Services, Inc., Entergy Power, Inc., Entergy Power Marketing Corporation, Entergy Arkansas, Inc., and Entergy Texas, Inc. (collectively, "Entergy"), contend that the trial court (1) lacked subject matter jurisdiction over this suit, (2) abused its discretion in finding that the requisites for class certification had been established, and (3) abused its discretion by making findings of fact and conclusions of law that misstate and misapply the applicable law.

We reverse and render.

## Background

### A.    Factual Background

Entergy Corporation is a public utilities holding company with six electric utility operating companies: Entergy Gulf States Louisiana, L.L.C., Entergy Arkansas, Inc., Entergy Louisiana, LLC, Entergy Mississippi, Inc., Entergy New

---

[1]    TEX. CIV. PRAC. & REM. CODE ANN. §§ 134.001–.005 (Vernon 2011 & Supp. 2014).

2

Orleans, Inc., and Entergy Texas, Inc. ("ETI"). These six companies, which operate in four southern states, provide electrical service to approximately 2.6 million retail customers.[2]

Each operating company has electricity generation facilities, consisting of nuclear, coal, natural gas, or oil-fired generating plants. The companies are parties to the Entergy System Agreement ("ESA"), a federal tariff under which power is shared and distributed.[3] The companies also purchase power from each other and from non-affiliated third parties in the power market. The ESA provides for centralized control of power purchases, operations, and use of available resources throughout the Entergy System. Although each company operates its generation, transmission, and distribution systems independently, production, purchasing, and sale of wholesale electricity on behalf of those companies to meet the needs of retail and wholesale customers are controlled centrally by Entergy Services, Inc. ("ESI").

ESI operates a Systems Operation Center, located in The Woodlands, which controls the selection of power ("dispatch decisions"). The ESA permits the System Operator to purchase power at wholesale from third-party suppliers. The

---

[2]   The generation and bulk transmission assets of these six companies are referred to as the "Entergy System."

[3]   A "tariff" is a document listing a public utility's rates and services and having the force and effect of law. *See First Assembly of God, Inc. v. Tex. Utils. Elec. Co.*, 52 S.W.3d 482, 489 (Tex. App.—Dallas 2001, no pet.).

System Operator controls daily operations and is in charge of determining whether system-generated power is sufficient to meet capacity needs or whether purchasing third-party power is necessary. ESI performs a monthly accounting, assigning a portion of the total power resources used by the whole system to each operating company, generating an "intra-system" bill. The cost is dictated by a formula in Service Schedule MSS-3 of the ESA, which governs the intra-company accounting for system resources.

### B.    *Procedural Background*

On August 5, 2003, Jenkins filed suit against Entergy[4] alleging that it had devised and operated an improper energy-purchasing scheme under which it had selected internally generated, higher-priced electrical power while rejecting less expensive, available third-party power, resulting in theft from Texas retail power customers in violation of the Theft Act. On September 15, 2003, Entergy removed the suit to federal court alleging federal question jurisdiction. The federal court remanded the case to state court, concluding that the suit did not invoke federal law.

On April 23, 2004, Entergy filed a motion to dismiss for want of jurisdiction, contending that jurisdiction of Jenkins's claims was preempted by the Federal Energy Regulatory Commission ("FERC") and the Texas Public Utilities

---

[4]    Although not originally named as a defendant in the suit, Entergy Gulf States, Inc. (appellant ETI's predecessor) later intervened.

Commission ("PUC") and that the claims were also barred by the filed-rate doctrine. On November 24, 2004, the trial court granted Entergy's motion to dismiss, finding that it lacked subject matter jurisdiction over Jenkins's claims.

Jenkins appealed the trial court's order dismissing the case. In *Jenkins v. Entergy Corp.*, 187 S.W.3d 785 (Tex. App.—Corpus Christi 2006, pet. denied) ("*Jenkins I*"), the Corpus Christi Court of Appeals reversed the trial court's order dismissing the suit for lack of subject matter jurisdiction. On June 6, 2012, Jenkins filed a motion to certify a class consisting of Texas retail customers served by ETI who were billed and paid for electric power from January 1, 1994, to the present. Entergy filed a second motion to dismiss for lack of jurisdiction and three motions for summary judgment. The trial court denied the motion to dismiss and the summary judgment motions.

The parties submitted extensive briefing on class certification issues, and the trial court held a certification hearing lasting several days. On April 30, 2012, the trial court granted Jenkins's motion for class certification and issued extensive findings of fact and conclusions of law. Entergy timely perfected this interlocutory appeal.

**Analysis**

In three issues, Entergy contends that the trial court (1) lacks subject matter jurisdiction over Jenkins's claims, (2) abused its discretion in finding that Jenkins

5

had established the requirements for class certification, and (3) abused its discretion by making findings of fact and conclusions of law that misstate and misapply the law. Jenkins argues that *Jenkins I*, which rejected Entergy's jurisdictional arguments, is the law of the case and prohibits reconsideration of the subject-matter-jurisdiction issue. Entergy urges us to hold that *Jenkins I* is not the law of the case because (1) the circumstances and evidence have changed, (2) *Jenkins I* was wrongly decided, (3) the law of the case doctrine should not be applied to subject matter jurisdiction determinations, and (4) *Jenkins I* did not address all of the issues raised in this appeal.

### A. Law of the Case

Because this case comes to us on appeal following remand for further proceedings in the trial court by the Corpus Christi Court of Appeals in *Jenkins I*, which reversed the trial court's previous order dismissing the case for want of jurisdiction, we consider, as a preliminary matter, the law of the case doctrine to determine whether the Corpus Christi Court of Appeals' decision prevents us from considering Entergy's jurisdictional arguments.

"Subject matter jurisdiction is 'essential to a court's power to decide a case.'" *City of Houston v. Rhule*, 417 S.W.3d 440, 442 (Tex. 2013) (per curiam) (quoting *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 553–54 (Tex. 2000)). "Without jurisdiction the court cannot proceed at all in any cause; it may not

6

assume jurisdiction for the purpose of deciding the merits of the case." *Fin. Comm'n of Tex. v. Norwood*, 418 S.W.3d 566, 578 (Tex. 2013) (quoting *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431, 127 S. Ct. 1184, 1191 (2007)). "The failure of a jurisdictional requirement deprives the court of the power to act (other than to determine that is has no jurisdiction), and ever to have acted, as a matter of law." *City of DeSoto v. White*, 288 S.W.3d 389, 393 (Tex. 2009) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Loutzenhiser*, 140 S.W.3d 351, 359 (Tex. 2004)). Thus, "[a] judgment is void if rendered by a court without subject matter jurisdiction." *In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 309 (Tex. 2010) (orig. proceeding). "[N]ot only *may* an issue of subject matter jurisdiction 'be raised for the first time on appeal by the parties or by the court', a court is *obliged* to ascertain that subject matter jurisdiction exists regardless of whether the parties questioned it." *Id.* at 306 (quoting *Loutzenhiser*, 140 S.W.3d at 358) (emphasis in original); *City of Allen v. Pub. Util. Comm'n of Tex.*, 161 S.W.3d 195, 199 (Tex. App.—Austin 2005, no pet.) ("[T]he question of jurisdiction is fundamental and can be raised at any time in the trial of a case or on appeal.").

The law of the case doctrine is defined as "that principle under which questions of law decided on appeal to a court of last resort will govern the case throughout its subsequent stages." *Loram Maint. of Way, Inc. v. Ianni*, 210 S.W.3d 593, 596 (Tex. 2006); *Brown & Brown of Tex., Inc. v. Omni Metals, Inc.*, 317

7

S.W.3d 361, 373 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Under the law of the case doctrine, a court of appeals will ordinarily be bound by its initial decision if there is a subsequent appeal in the case. *Briscoe v. Goodmark Corp.*, 102 S.W.3d 714, 716 (Tex. 2003). "By narrowing the issues in the successive stages of the litigation, the law of the case doctrine is intended to achieve uniformity of decision as well as judicial economy and efficiency." *Id.* (quoting *Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex. 1986)). This doctrine is based on public policy and is aimed at bringing finality to litigation. *Id.*

A decision rendered on an issue by an appellate court does not, however, absolutely bar reconsideration of the issue on a second appeal. *Id.* Rather, the law of the case doctrine "'merely expresses the practice of the courts generally to refuse to reopen what has been decided.'" *See It's the Berry's, LLC v. Edom Corner, LLC*, 271 S.W.3d 765, 771 (Tex. App.—Amarillo 2008, no pet.) (quoting *Messenger v. Anderson*, 225 U.S. 436, 444, 32 S. Ct. 739, 740 (1912)).

The application of the law of the case doctrine lies within the discretion of the court, depending on the circumstances of the case. *Briscoe*, 102 S.W.3d at 716; *see also City of Houston v. Harris*, 192 S.W.3d 167, 171 (Tex. App.—Houston [14th Dist.] 2006, no pet.) ("Application of the [law of the case] doctrine is flexible and must be left to the discretion of the court and determined according to the circumstances of the case."). The doctrine does not necessarily apply when either

8

the issues or the facts presented in successive appeals are not substantially the same as those involved in the first trial.[5] *Pitman v. Lightfoot*, 937 S.W.2d 496, 513 (Tex. App.—San Antonio 1996, writ denied). Moreover, it is an exception to the law of the case doctrine that the original decision was clearly erroneous. *Briscoe*, 102 S.W.3d at 716.

Most critically, the law of the case doctrine does not either confer or limit subject matter jurisdiction and is not a limitation on the power of a court to act. *See It's the Berry's*, 271 S.W.3d at 771–72 (refusing to apply law of the case doctrine to bar review of district court's exercise of subject matter jurisdiction). "Subject matter jurisdiction cannot be conferred by consent, waiver, or estoppel at any stage of a proceeding." *Id.* (quoting *Tourneau Houston, Inc. v. Harris Cnty. Appraisal Dist.*, 24 S.W.3d 907, 910 (Tex. App.—Houston [1st Dist.] 2000, no pet.)). It follows that subject matter jurisdiction cannot be conferred by a prior decision in the case.

Indeed, both the Texas Supreme Court and the Fourteenth Court of Appeals have made clear that the law of the case doctrine does not preclude a re-examination of the court's jurisdiction. *See Briscoe*, 102 S.W.3d at 717 ("Because application of the law of the case doctrine is discretionary, the court of appeals had

---

[5]   The other occasion allowing the doctrine to be set aside—when a partial summary judgment is followed by a trial on the merits—is not relevant to this appeal. *See Hudson v. Wakefield*, 711 S.W.2d 628, 630–31 (Tex. 1986).

the authority to re-visit its jurisdictional decision."); *Harris*, 192 S.W.3d at 171 ("Application of the [law of the case] doctrine is flexible and must be left to the discretion of the court and determined according to the circumstances of the case."). To the contrary, an appellate court is "*obliged* to ascertain that subject matter jurisdiction exists regardless of whether the parties questioned it." *See In re United Servs. Auto. Ass'n*, 307 S.W.3d at 306 (emphasis in original). We therefore hold that the law of the case doctrine does not preclude our reexamination of the trial court's subject matter jurisdiction over Jenkins's case.

Jenkins, however, argues that our decision to review a jurisdictional determination by a prior court in the same case creates a conflict with the Fourteenth Court of Appeals' opinion in *Jacobs v. Jacobs*. Jenkins misreads *Jacobs*. In that case, our sister court *did* review the prior jurisdictional determination before agreeing with the appellee that the prior decision of the court "govern[ed] any jurisdictional and arbitration-related questions in this appeal." 448 S.W.3d 626, 630 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The court noted that the appellant "asserts virtually the same arguments in this current appeal" as it did in the prior appeal, and it then briefly addressed the jurisdictional issue and concluded, as it had in its original opinion, that the trial court did not lack jurisdiction to issue the challenged orders. *Id.* at 631. As Entergy points out, the Fourteenth Court of Appeals appropriately exercised its discretion in *Jacobs* as to

10

whether to apply the law of the case doctrine, and it also reexamined and explicitly reaffirmed its prior jurisdictional conclusion.

Instead of conflicting with *Jacobs*, our decision in this case to reexamine the jurisdictional issue reflects the appellate court's discretion to decide whether to apply the law of the case doctrine. Moreover, as stated above, jurisdiction is a fundamental inquiry and the law of the case doctrine does not preclude a re-examination of a prior jurisdictional decision. *See In re United Servs. Auto. Ass'n*, 307 S.W.3d at 306; *Briscoe*, 102 S.W.3d at 717. We, therefore, review de novo whether the Texas courts have subject matter jurisdiction over Jenkins's claims in this litigation.

### B. Entergy's Jurisdictional Arguments

Entergy argues that the trial court lacks subject matter jurisdiction over Jenkins's claims for several reasons. First, Entergy argues that the FERC has exclusive jurisdiction over those claims. Second, Entergy argues that if this Court determines that FERC does not have exclusive jurisdiction, then the PUC, which governs retail rates for power sold to Texas consumers, has exclusive jurisdiction. Third, Entergy asserts that both the federal and Texas filed-rate doctrines bar Jenkins's suit. We conclude that FERC has exclusive jurisdiction over Jenkins's claims and that, therefore, those claims must be dismissed.

11

### 1. Exclusive Jurisdiction

An agency has exclusive jurisdiction when Congress or the Legislature has granted that agency the sole authority to make an initial determination in a dispute. *In re Entergy Corp.*, 142 S.W.3d 316, 321 (Tex. 2004) (orig. proceeding); *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 221 (Tex. 2002). Likewise, an agency has exclusive jurisdiction "when a pervasive regulatory scheme indicates that Congress intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed." *In re Entergy Corp.*, 142 S.W.3d at 322 (quoting *David McDavid Nissan*, 84 S.W.3d at 221)).  If an agency has exclusive jurisdiction, a party must exhaust all administrative remedies before seeking review of the agency's action.  *Id.* at 321 (citing *Cash Am. Int'l, Inc. v. Bennett*, 35 S.W.3d 12, 15 (Tex. 2000)).  Until the party has exhausted all administrative remedies, the trial court lacks subject matter jurisdiction and must dismiss any claims that fall within the agency's exclusive jurisdiction.  *Id.* at 321–22; *Oncor Elec. Delivery Co. LLC v. Giovanni Homes Corp.*, 438 S.W.3d 644, 648 (Tex. App.—Fort Worth 2014, pet. filed).  Whether an agency has exclusive jurisdiction is a question of law that we review de novo.  *In re Entergy Corp.*, 142 S.W.3d at 322; *David McDavid Nissan*, 84 S.W.3d at 222.

## 2. FERC's Jurisdiction

Jenkins claims that ETI, in conspiracy with its parent and affiliates (Entergy), stole the class's money by charging them for using system-generated electrical power instead of cheaper power available from third parties, in violation of the Theft Act.

As the Corpus Christi Court of Appeals noted in *Jenkins I*, the ESA provides that: (1) the companies within the Entergy System, with the consent of or under conditions specified by the operating committee, may agree to purchase capacity or energy from outside sources that, if purchased by the operating company, shall be allocated amongst the companies in the System in any manner mutually agreeable to them; (2) the operating committee may purchase energy under economic dispatch or emergency conditions; (3) the operating committee is to ensure the continuous supply or capacity of energy, provide for and coordinate safe dispatching and the proper distribution of reserves, coordinate negotiations for the interchange and sale of power and energy, including the sale and delivery to others on a profitable basis of power and energy not required for system purposes, and to secure power from external sources as may be required or will result in savings to the companies; and (4) the operating committee shall determine availability of energy for purchase from or sale to outside systems in an economical manner. *See* 187 S.W.3d at 806.

As Entergy explains and its evidence shows, electricity cannot be practically stored. Rather, at all times, available power must match demand, which is based upon ever-changing customer usage. To match power and demand, Entergy selects generating resources to meet estimated future demand (the commitment process) and determines the level at which committed resources will be operated and adjusted to meet the instantaneous demand (the demand process). These processes involve determining what third-party power is available, what price the seller is demanding, what quantity is available each hour, whether transmission service is available to deliver the purchased power to where it is needed, whether available third-party power can be automatically dispatched or must be purchased in unchangeable blocks of time and energy, whether there is system-generated power that could and should be displaced, and whether reserve requirements can be met.

Operation of the System requires that a significant portion of the System's resources be able to respond to changes in demand through instantaneous changes in the amount of electricity provided, which requires flexible system generators. Entergy relies on flexible generation to be able to comply with federal law, which permits industrial co-generators on the Gulf Coast to require Entergy to take excess power into the System or to cease supplying power to the System without notice. Entergy avers that third-party power is generally not flexible, limiting the amount of third-party power the Entergy System can use.

14

Entergy's fuel and purchased-power costs are subjected to scrutiny by FERC under the Federal Power Act ("FPA") and by the PUC under the Public Utilities Regulatory Act ("PURA"). FERC regulates wholesale power transactions and has exclusive jurisdiction over wholesale power rates. The PUC governs ETI's recovery of fuel and purchased-power costs from its customers and, in fuel reconciliation proceedings, it reviews and makes a final determination as to the reasonableness and necessity of ETI's incurred fuel and purchased-power costs. The cost of system-generated or third-party power is charged directly to ratepayers, subject to PUC prudence review. This cost charged to ratepayers is the subject of Jenkins's sole complaint—that Entergy has over-charged ratepayers in violation of the Theft Act.

Under the FPA, FERC has exclusive jurisdiction of the wholesale sale or transmission of electricity in interstate commerce. *See* 16 U.S.C.A. § 824(a), (b)(1) (LexisNexis 2011); *Entergy La., Inc. v. La. Pub. Serv. Comm'n*, 539 U.S. 39, 41, 123 S. Ct. 2050, 2053 (2003). FERC's exclusive jurisdiction extends not only to rates but also to power allocations that affect wholesale rates. *See Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354, 371–72, 108 S. Ct. 2428, 2439 (1988) (holding that states may not alter allocations of power ordered by FERC by substituting their own determinations of what would be just and fair; FERC-mandated allocations of power are binding on states and must be treated as

15

fair and reasonable when determining retail rates, and "[s]tates may not bar regulated utilities from passing through to retail consumers FERC-mandated wholesale rates").

FERC's jurisdiction encompasses the determination of just and reasonable rates—including all classifications, practices, regulations, and contracts affecting rates, as well as the authority to hear complaints that an existing rate (or associated charge, classification, rule, regulation, practice, or contract) is unjust, unreasonable, unduly discriminatory or preferential. *See* 16 U.S.C.A. §§ 824d, 824e (LexisNexis 2011 & Supp. 2015). FERC also has exclusive jurisdiction to make a final determination as to whether the rate has been violated. *AEP Tex. N. Co. v. Tex. Indus. Energy Consumers*, 473 F.3d 581, 586 (5th Cir. 2006). The "filed rate doctrine" requires that interstate power rates filed with, or fixed by, FERC must be given binding effect by state utility commissions determining intrastate rates because the FPA and the Supremacy Clause preempt any state action modifying or overruling the filed rate. *See* 16 U.S.C.A. § 824(b)(1) (LexisNexis 2011); *Entergy La.*, 539 U.S. at 47, 123 S. Ct. at 2056; *AEP Tex. N. Co.*, 473 F.3d at 584.

The FPA gives states, municipalities, and retail ratepayers the right to participate in FERC proceedings and to file complaints. 16 U.S.C.A. §§ 824d, 824e, 825e (LexisNexis 2011 & Supp. 2015). The FPA also gives FERC exclusive

jurisdiction to remedy rate violations by providing refunds. *Id.* § 824e; *AEP Tex. N. Co.*, 473 F.3d at 586. And it provides civil penalties for violating any provision of the governing chapter of the FPA or any rule or order thereunder. 16 U.S.C.A. § 825o-1(b) (LexisNexis 2011 & Supp. 2015).

The *Entergy Louisiana* case is similar to this case. *Entergy Louisiana* involved the same group of energy companies as in this case and a similar issue involving FERC preemption of state utility commission regulation of power rates under the filed-rate doctrine. Entergy Louisiana shared capacity with its fellow operating companies in the Entergy System, allowing the companies "to access additional capacity when demand exceeds the supply generated by that company alone." *Entergy La.*, 539 U.S. at 42, 123 S. Ct. at 2053. Pursuant to MSS-1 of the System Agreement, the same ESA at issue here, Entergy allocated the costs of keeping excess capacity available among the operating companies. *Id.* MSS-1 provided a formula to calculate "cost-equalization" payments among the companies in the System, which ensured that companies within the System that used more capacity than they contributed ("short" companies) made payments to companies that contributed more capacity than they used ("long" companies). *Id.* at 42–43, 123 S. Ct. at 2053–54. Entergy determined each company's capacity on a monthly basis, and a company that contributed more capacity than it used received a payment equal to its average cost of the company's generating units

17

multiplied by the number of megawatts the company was considered "long." *Id.* at 43, 123 S. Ct. at 2054. Under Entergy's Extended Reserve Shutdown ("ERS") program, the operating committee could designate some generating units as not immediately necessary for capacity needs; but because these units could be activated if energy demand increased in the future, these units were considered "available" under the MSS-1's cost-equalization calculations. *Id.*

FERC approved an amendment to the System Agreement that "allow[ed] an ERS unit to be treated as available under MSS-1 if the operating committee determine[d] it intend[ed] to return the unit to service at a future date." *Id.* at 44, 123 S. Ct. at 2054. Entergy Louisiana, which routinely had to make cost-equalization payments to other companies within the System pursuant to MSS-1, filed its 1997 retail rates with the Louisiana Public Service Commission ("LPSC")—the counterpart to the Texas PUC in this case. *See id.* at 45, 123 S. Ct. at 2055. The LPSC determined that, although it *was* preempted from determining whether the operating committee's inclusion of ERS units prior to August 5, 1997—the date of the FERC order approving the amendment to the System Agreement—was prudent, it *was not* preempted from "disallowing MSS-1 related costs as imprudent subsequent to August 5, 1997." *Id.* The LPSC "concluded that the operating committee's treatment of ERS units after August 5, 1997, was imprudent and that [Entergy Louisiana's] MSS-1 payments would not be

18

considered when setting [its] retail rates in Louisiana." *Id.* at 46, 123 S. Ct. at 2055.

The United States Supreme Court determined that the LPSC's order "impermissibly 'traps' costs that have been allocated in a FERC tariff" in violation of the filed-rate doctrine. *Id.* at 49, 123 S. Ct. at 2057. The Court noted that the System Agreement "leaves the classification of ERS units to the discretion of the operating committee" instead of involving a specific FERC-mandated cost-allocation. *Id.* The Court refused to create an exception to the filed-rate doctrine, even though the case did not involve a specific FERC mandate, reasoning that to do so would "substantially limit FERC's flexibility in approving cost allocation arrangements." *Id.* at 50, 123 S. Ct. at 2057. The Court also held that preemption did not depend on the existence of a FERC order approving the particular classification at issue, stating, "It matters not whether FERC has spoken to the precise classification of ERS units, but only whether the FERC tariff dictates how and by whom that classification should be made." *Id.*

The same FERC-approved System Agreement that governed in *Entergy Louisiana* governs Entergy's operations in this case. The precise duty Jenkins claims was violated—the duty to acquire energy at the least cost—is expressly set out in ESA Schedule MSS-3 section 30.02:

> The System Capability shall be operated as scheduled and/or controlled by the System Operator to obtain the lowest reasonable cost

19

of energy to all the Companies consistent with the requirements of daily operating generation reserve, voltage control, electrical stability, loading of facilities and continuity of service to the customers of each Company.

Likewise, Entergy's "central dispatching function," the control of generating levels, was undertaken pursuant to sections 4.08 and 6.0l of the ESA. Section 4.08 provides, "Under general direction of the Operating Committee, [Entergy] Services will operate a centralized operations center . . . to dispatch the capacity and energy capability of the Companies, in the efficient, economical, and reliable manner as provided in this Agreement." And section 6.01 provides, "The operation of the System shall be controlled by the System Operations Center which is operated by [Entergy] Services."

ESA section 6.02 sets out the duties of the System Operating Center. This section provides that Entergy Services shall "[d]etermine the most effective scheduling of sources for the reliable supply of power and energy on an economical basis to the companies" and "[d]etermine the availability of energy for purchase from or sale to outside systems on an economical basis under effective contracts and arrange for and schedule such transactions." The ESA thus allows the System Operator to meet energy demand by purchasing third-party power, but the ESA does not specifically dictate the amount of power the System Operator is to purchase from third-party sources relative to system-generated power. This

20

decision is therefore left to the System Operator's discretion under the FERC-approved ESA.

Entergy's operation and maintenance of computer facilities to dispatch the system and determine billing information in the wholesale market are specifically governed by ESA section 6.02, which provides that Entergy Services shall "[s]upervise the operation and maintenance of computer facilities specified by the Operating Committee for the following purposes: 1. Economic system dispatch, 2. Determination of billing information, and 3. Determination of other data required by the Operating Committee." Decisions whether to dispatch Entergy-owned resources or to purchase wholesale power off-system are likewise governed by ESA sections 4.02, 4.03, 4.08 and 6.02. And, once energy has been purchased and dispatched, the allocation of costs among the companies of the Entergy system is governed by ESA Schedule MSS-3, while the calculation of intra-System billings for exchange energy is determined in accord with ESA Schedule MSS-3 sections 30.08, 30.09 and 30.10.

Finally, Jenkins's argument that only express or specific rulings by FERC invoke its exclusive jurisdiction was explicitly rejected by the Supreme Court in *Entergy Louisiana*. *See* 539 U.S. at 50, 123 S. Ct. at 2057 (stating that "the 'view that the pre-emptive effect of FERC jurisdiction turn[s] on whether a particular matter was actually determined in the FERC proceedings' has been 'long

21

rejected'") (quoting *Miss. Power & Light Co.*, 487 U.S. at 374, 108 S. Ct. at 2440).

Indeed, many years before *Entergy Louisiana*, in *Mississippi Power & Light*, the Supreme Court, invoking the Supremacy Clause, had expressly forbidden the states to regulate "in areas where FERC has properly exercised its jurisdiction to determine just and reasonable wholesale rates or to insure that agreements affecting wholesale rates are reasonable" and it had also forbidden the states to conduct "any proceedings that challenge the reasonableness of FERC's allocation." 487 U.S. at 374, 108 S. Ct. at 2440–41. If states may not exercise jurisdiction to determine the reasonableness of agreements affecting wholesale rates and to set wholesale rates in this area, *a fortiori* individual retail consumers may not invoke the jurisdiction of state courts to challenge FERC's exercise of its jurisdiction to determine these rates.

The whole basis of Jenkins's theft claim in this case is that Entergy stole money from the class of retail customers Jenkins represents, in violation of the Texas Theft Liability Act, by not purchasing power from outside its own system at more favorable wholesale rates. Specifically, Jenkins alleges that Entergy manipulated the computer programs used in making purchasing decisions, such that Entergy purchased more expensive system-generated power even though lower-cost third-party power was available, resulting in Entergy's charging higher rates to its retail customers. Jenkins seeks a refund of *retail* charges, but he

22

complains about Entergy's *wholesale* electricity purchases. Although Jenkins does not allege breach of the FERC-approved ESA as a cause of action, he challenges Entergy's purchasing decisions—whether to use allegedly available third-party electricity or system-generated electricity—which Entergy undertook pursuant to the ESA. Determining whether Entergy permissibly exercised its discretion in making its purchasing decisions thus necessarily requires consideration of the ESA, a FERC-approved tariff.

Jenkins contends, however, that the jurisdictional analysis in the recent United States Supreme Court case of *Oneok, Inc. v. Learjet, Inc.*, a case that involved construction of the Natural Gas Act, a statute analogous to the FPA, governs this case and requires a holding that his state-law claims are not pre-empted and that the trial court has jurisdiction over them. *See* 135 S. Ct. 1591 (2015).

In *Oneok*, retail natural gas consumers brought suit against interstate natural gas pipelines, alleging that the pipelines had manipulated the prices of natural gas reported to privately published natural gas indices, which were then used to determine prices for their natural gas contracts. *Id.* at 1597–98. The consumers filed state-law antitrust claims against the pipelines. *Id.* at 1598. The district court granted summary judgment in favor of the pipelines, ruling that the Natural Gas Act pre-empted the state-law antitrust claims because the pipelines were "natural

23

gas companies engaged in the transportation of natural gas in interstate commerce" and the allegedly wrongful practices that the consumers, although retail customers, were targeting, "directly affected" wholesale natural gas rates, a matter within FERC's jurisdiction. *Id.*

The Ninth Circuit reversed the summary judgment in the pipelines' favor, noting that the price manipulation that was the basis of the consumers' complaint affected both wholesale sales, which were within FERC's jurisdiction under the Natural Gas Act, and retail sales, which were not. *Id.* at 1599. The Ninth Circuit held that the Natural Gas Act did not pre-empt the state-law antitrust claims "aimed at obtaining damages for excessively high *retail* natural-gas prices stemming from interstate pipelines' price manipulation, even if the manipulation raised *wholesale* rates as well." *Id.* (citing *In re W. States Wholesale Natural Gas Antitrust Litig.*, 715 F.3d 716, 729–36 (2013) (emphasis in original)).

The Supreme Court granted certiorari to determine "whether the Natural Gas Act pre-empts retail customers' state antitrust law challenges to practices that also affect wholesale rates." *Id.* The Court first noted that *Oneok* involved a question of "field pre-emption," that is, whether Congress has, either implicitly or explicitly, forbidden the States from taking action in the field that the Natural Gas Act pre-empts. *Id.* at 1595. The Court then stated that when a state law, such as the antitrust laws at issue in *Oneok*, can be applied both to sales covered by the Natural

Gas Act (i.e., wholesale sales) and sales that are not covered by the Natural Gas Act (i.e., retail sales), courts must "proceed cautiously, finding pre-emption only where detailed examination convinces us that a matter falls within the pre-empted field as defined by our precedents." *Id.* at 1599. An important consideration in determining whether a state law is pre-empted is "the *target* at which the state law *aims*," and the "target" "must mean more than just the physical activity that a State regulates." *Id.* at 1599–1600 (emphasis in original).

In *Oneok*, the consumers' claims were solely directed at the pipelines' practices involving retail rates, a matter the Natural Gas Act leaves to the states, rather than at practices governed by a FERC-approved tariff, as here. *See id.* at 1600. The Supreme Court held that antitrust laws "are not aimed at natural-gas companies in particular, but rather all business in the marketplace," and their "broad applicability" supports "a finding of no pre-emption here." *Id.* at 1601. The Court reasoned that the states have a "long history of providing 'common-law and statutory remedies against monopolies and unfair business practices,'" and the consumers' suits in *Oneok* "relied on this well established state power." *Id.* (quoting *California v. ARC Am. Corp.*, 490 U.S. 93, 101, 109 S. Ct. 1661, 1665 (1989)).

The *Oneok* Court distinguished *Mississippi Power & Light Co.*, noting that that case "is best read as a conflict pre-emption case, not a field pre-emption case."

*Id.* (citing *Miss. Power & Light Co.*, 487 U.S. at 377, 108 S. Ct. at 2442). "Conflict pre-emption," as the Court noted in *Oneok*, "exists where 'compliance with both state and federal law is impossible,' or where 'the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* at 1595 (quoting *ARC Am. Corp.*, 490 U.S. at 100–01, 109 S. Ct. at 1665). The Court further stated that the "state inquiry" at issue in *Mississippi Power & Light* was pre-empted because it was directed at sales within FERC's jurisdiction "in a way that [the *Oneok* consumers'] state antitrust lawsuits are not." *Id.* at 1602.

By contrast to the field pre-emption at issue in *Oneok*, the Court stated that the state action involved in *Mississippi Power & Light*, an inquiry into the reasonableness of energy sales approved by FERC, "was effectively an attempt to 'regulate in areas where FERC has properly exercised its jurisdiction to determine just and reasonable wholesale rates.'" *Id.* (quoting *Miss. Power & Light Co.*, 487 U.S. at 374, 108 S. Ct. at 2440). The consumers' claims in *Oneok*, on the other hand, "seek to challenge the background marketplace conditions that affected both" wholesale rates and retail rates, rather than challenging "the reasonableness of rates expressly approved by FERC." *Id.* The *Oneok* Court, in affirming the Ninth Circuit and holding that the consumers' state-law claims were not pre-empted, specifically noted that the conflict pre-emption doctrine "should prove

26

sufficient to address" conflicts between "state antitrust law proceedings and the federal rate-setting process," but the parties had not argued conflict pre-emption, so that issue must be left to the courts below to decide. *Id.*

Jenkins contends that, although *Oneok* involves the Natural Gas Act instead of the FPA, the pre-emption analysis is the same for both acts, and the statutes, which contain similar language, should be read *in pari materia*, such that *Oneok*'s construction of the limits of FERC's jurisdiction under the Natural Gas Act should also apply here. We disagree.

Both the Natural Gas Act and the FPA contain similar jurisdictional language and similar language describing FERC's authority. The Natural Gas Act provides that it shall apply: (1) "to the transportation of natural gas in interstate commerce"; (2) "to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale"; and (3) "to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation." 15 U.S.C.A. § 717(b) (LexisNexis 2006 & Supp. 2015); *Oneok*, 135 S. Ct. at 1596. The Natural Gas Act specifically states that it "shall not apply to any other transportation or sale of natural gas . . . ." 15 U.S.C.A. § 717(b). Similarly, the FPA applies "to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in

interstate commerce, but [with some exceptions not applicable here] shall not apply to any other sale of electric energy." 16 U.S.C.A. § 824(b)(1).

Both the Natural Gas Act and the FPA provide that if FERC finds any rate charged or collected by the respective energy company "subject to the jurisdiction of" FERC or finds "any rule, regulation, practice, or contract affecting such rate, charge, classification [to be] unjust, unreasonable, unduly discriminatory or preferential, [FERC] shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order." 15 U.S.C. § 717d(a) (LexisNexis 2006 & Supp. 2015) (Natural Gas Act); 16 U.S.C. § 824e(a) (Federal Power Act).

Jenkins argues that because of the similarities in language in the Natural Gas Act and the FPA, the pre-emption analysis articulated in *Oneok* should apply in this case and mandates a holding that his civil theft claim against Entergy does not fall within FERC's exclusive jurisdiction. We disagree.

As Entergy points out, unlike the gas sales price-fixing by retailers among themselves in violation of state antitrust laws alleged in *Oneok,* Entergy's purchasing decisions are governed by the ESA, a FERC-approved tariff that gives discretion to Entergy to meet its capacity needs by purchasing power from within the Entergy system or by purchasing third-party power. A tariff filed with a federal agency is the equivalent of a federal regulation. *See Cahnmann v. Sprint*

28

*Corp.*, 133 F.3d 484, 488 (7th Cir. 1998) (stating such in context of tariff on file with Federal Communications Commission); *see also Lowden v. Simonds-Shields-Lonsdale Grain Co.*, 306 U.S. 516, 520, 59 S. Ct. 612, 614 (1939) ("Until changed, tariffs bind both carriers and shippers with the force of law."). This case thus involves a question of conflict pre-emption: whether Jenkins's claims under the Texas Theft Liability Act that Entergy failed to obtain the best price available on the wholesale gas market when satisfying the demand for electricity conflicts with the discretion granted to Entergy to purchase electricity under the ESA, a FERC-approved tariff. *Oneok*—which involves field pre-emption—stands in contrast to this case in that it involves the question of price-fixing among sellers of gas to the retail market after it has left the interstate pipeline transmission system. It therefore presented the question of whether FERC regulation had pre-empted the entire field of gas prices—a question which the Supreme Court answered negatively.

Because resolving the dispute in this case involves the consideration and interpretation of a FERC-approved tariff, we conclude that this dispute falls within FERC's exclusive jurisdiction. *See AEP Tex. N. Co.*, 473 F.3d at 585 ("FERC, not the state, is the appropriate arbiter of any disputes involving a tariff's interpretation."); *see also Entergy La.*, 539 U.S. at 50, 123 S. Ct. at 2057 ("It matters not whether FERC has spoken to the precise classification of ERS units,

29

but only whether the FERC tariff dictates how and by whom that classification should be made.").

Because Jenkins did not exhaust his administrative remedies by first bringing this dispute before FERC, we hold that the trial court lacks subject matter jurisdiction over the case. *See In re Entergy Corp.*, 142 S.W.3d at 321–22 (holding that when agency has exclusive jurisdiction over dispute, party must exhaust all administrative remedies before seeking relief in district court from agency decision, and until party exhausts administrative remedies, trial court lacks subject matter jurisdiction). We hold that the trial court erroneously denied Entergy's motion to dismiss for lack of jurisdiction and that the trial court's class-certification order is therefore void.

Accordingly, we sustain Entergy's first issue.[6]

---

[6] Given our disposition of Entergy's first issue, we need not reach its second and third issues. *See* Tex. R. App. P. 47.1.

## Conclusion

We declare the trial court's order granting class certification void. We reverse the order of the trial court denying Entergy's motion to dismiss and render judgment dismissing all claims against Entergy.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Huddle, and Lloyd.

Justice Lloyd, concurring.

31