**Opinion issued November 26, 2019**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-17-00881-CV

————————————

**CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, SYNDICATE NUMBERS 2020, 1084, 2001, 457, 510, 2791, 2987, 3000, 1221, 5000 AND NAVIGATORS INSURANCE COMPANY UK, Appellants**

**V.**

**PRIME NATURAL RESOURCES, INC., Appellee**

---

**On Appeal from the 129th District Court**
**Harris County, Texas**
**Trial Court Case No. 2015-51137**

---

## O P I N I O N

This oil and gas insurance dispute originated in 2005, when a well (the H-2 Well) and platform (the H-Platform) owned in part by appellee Prime Natural Resources, Inc., were damaged during Hurricane Rita. Shortly after the storm, on

September 29, 2005, Prime informed its insurance providers, appellants Certain Underwriters at Lloyd's, London, Syndicate Numbers 2020, 1084, 2001, 457, 510, 2791, 2987, 3000, 1221, 5000, and Navigators Insurance Company UK (collectively, Underwriters), of its losses.

Prime made a claim on its policy with Underwriters, and Underwriters paid a portion of that claim—$1,125,000, which includes the policy limits for the loss of the H-Platform. In September 2007, Prime filed it first lawsuit seeking approximately $4.7 million in remaining unpaid expenses under the policy. In December 2007, Underwriters made a partial payment of approximately $2,880,866 "for covered claims arising from pipeline damage and debris removal, as well as well-redrill operations." *See Prime Nat. Res., Inc. v. Certain Underwriters at Lloyd's, London*, No. 01-11-00995-CV, 2015 WL 1457534, at \*2 (Tex. App.—Houston [1st Dist.] Mar. 26, 2015, no pet.) (mem. op.) (hereinafter, *Prime I*). In *Prime I*, the trial court and this Court construed the terms of the policy and ruled in favor of Underwriters that the portion of the policy covering the H-2 Well did not cover expenses for the H-Platform. *Id.* at \*4.

After *Prime I* issued, Prime filed the current lawsuit seeking approximately $1.8 million in unpaid policy benefits for expenses it incurred related to redrilling and recompleting the H-2 Well and making the H-2 Well safe from the risk of a blowout or loss of control due to the damage caused by Hurricane Rita. Prime also

2

alleged that Underwriters committed unfair or deceptive acts or practices in violation of Insurance Code Chapter 541, and that Underwriters violated Insurance Code Chapter 542's Prompt Payment Act resulting in Underwriters owing Prime statutory and prejudgment interest, including interest on the partial payment made in December 2007. Underwriters counterclaimed, alleging that they had overpaid Prime's claim and seeking approximately $1.8 million in damages as a result of the overpayment.

The jury found in favor of Prime, finding that Underwriters had failed to comply with the policy and that Prime was entitled to $1.8 million in unpaid policy benefits. The jury further found violations of the Insurance Code based on Underwriters' unfair practices, it found that Underwriters committed those violations knowingly, and it found that the December 2007 partial payment was made conditionally, entitling Prime to statutory interest. The trial court entered judgment on the jury's award and Prime's election of remedies for a total of $19,562,960.94.

On appeal, Underwriters challenge this judgment in three issues, arguing that: (1) because Prime's evidence of covered expenses was not based on the correct interpretation of the policy and *Prime I*, Prime failed to prove that Underwriters owed Prime additional policy benefits; (2) damages awarded under Chapter 541 for unfair or deceptive acts or practices should be reversed; and

3

(3) the trial court incorrectly awarded Chapter 542 interest and prejudgment interest on Underwriters' December 2007 partial payment. We conclude that the trial court properly instructed the jury on the interpretation of the policy and there was sufficient evidence to support the jury's findings of actual damages. We further conclude, however, that there was no evidence that Underwriters acted knowingly, and we hold that the tender of the December 2007 partial payment was unconditional. Accordingly, we affirm in part and reverse and remand in part for further proceedings consistent with this opinion.

## Background

Prime owns certain oil and gas drilling interests in the Gulf of Mexico, including a fifty-percent interest in the H-2 Well. The H-2 Well is part of a larger installation located about seventy-five miles south-southeast of Morgan City off the Louisiana coast in an area called Ship Shoal Block 148 (SS 148). The H-2 Well is a single well that stands alone adjacent to the H-Platform, a production platform. The owner of the remaining fifty-percent interest in the H-2 Well is W&T Offshore, Inc., which serves as the operator for the well installation.

Underwriters issued a "Wellsure Energy Package" insurance policy (the Policy) to insure, in part, Prime's interest in the H-2 Well and the H-Platform. Underwriters issued a substantially similar policy to W&T covering its interest in the H-2 Well and H-Platform. The Policy is divided into three sections. Section I

4

covers wells, with specific provisions in Section IA for "Control of Well Insurance" and an additional endorsement for "Making Wells Safe." Section IB addresses the "Expense of Redrilling/Recompletion" of wells. Section II covers platforms, caissons, pipelines, and flowlines.

On September 23, 2005, Hurricane Rita swept through the Gulf and damaged the H-2 Well. The windstorm toppled the H-Platform away from the H-2 Well and damaged the attached pipeline. Prime's expert described the damage to the H-2 Well and H-Platform as "catastrophic." An aerial survey completed shortly after the storm revealed that the H-2 Well and H-Platform were both missing and were no longer visible above the surface of the water. W&T and Prime later discovered that the outer thirty-inch conductor pipe that provided support for the entire well apparatus had a seven-foot crack in it and was bent to a ninety-degree angle about seven feet above the seabed. Control lines to subsurface controls and the wellhead were damaged. The H-2 Well was buried underneath debris, including some debris from the H-Platform. Prime's expert further indicated that due to the bend in the conductor pipe, the other casing strings—the smaller pipes located inside the conductor pipe—had failed, which was especially concerning because the H-2 Well had a history of corrosion that left the Well vulnerable to a sudden unintended release of hydrocarbons even though it was not yet leaking in the aftermath of the storm.

On September 29, 2005, Ken Reed with Prime emailed Alan Ammentorp, an employee of Matthews Daniel (MattDan), the firm responsible for adjusting Underwriters' claims. Reed informed Underwriters that the H-Platform and H-2 Well had been lost. Around that same time, W&T, as the H-2 Well's operator, placed Andy Scott in charge of overseeing the repairs to the Well, coordinating with the necessary contractors and governmental entities, communicating with and submitting bills to Prime as the co-owner of the Well, and communicating with Underwriters regarding insurance coverage through MattDan.

By November 2005, notes and emails from Ammentorp indicate that he, and, thus, MattDan, were aware that the H-Platform and the H-2 Well were on the sea floor. On November 28, 2005, Ammentorp wrote a report to Underwriters indicating that there was a constructive total loss of the H-Platform, and he recommended that Underwriters reserve $1,375,000—including $1,125,000 in platform Policy limits and $250,000 in pipeline limits—to pay this claim.

By the end of January 2006, Prime began requesting partial payment based on the total loss of the H-Platform. Around that same time in June 2006, W&T was finally able to commence repairs, which had been delayed because Hurricanes Rita and Katrina had struck within weeks of each other and had damaged hundreds of platforms, wells, and pipelines in the Gulf. W&T prioritized repairs to its wells that were actively leaking in the weeks after the storm, and it experienced numerous

6

delays caused by overburdened work crews, limited repair resources, and the lengthy permitting process dictated by the U.S. Department of the Interior's Mineral Management Service.

On June 16, 2006, Underwriters agreed to pay Prime the Policy limits for the loss of the H-Platform, and Underwriters subsequently issued a payment of $1,125,000 on July 5, 2006.

W&T continued making repairs, including cleaning up wreckage and debris; recompleting and restoring the H-2 Well, which, according to Scott—who oversaw the repairs and who later testified on behalf of Prime—required replacing the wellhead and the production tree;[1] reestablishing pipeline connections to the H-2 Well; and rebuilding the H-Platform. Scott further testified that W&T had regained control of the H-2 Well and had rendered it "safe" by September 10, 2006.

Over the next two months, W&T finished recompletion of the H-2 Well by installing a permanent Christmas tree and preparing to stimulate the Well. The total repair costs exceeded $17.5 million; Prime was required to pay half of that amount.

By January 2007, W&T had submitted to MattDan all the repair costs and supporting documentation, and W&T was paid on its claim in early March 2007 as

---

[1] Experts at trial explained that the wellhead is defined as the top of the well or the "surface termination of the wellbore that incorporates facilities for installing casing hangers during the well construction phase." Experts stated that the "Christmas tree" or "production tree" is the part of the well that allows the operator to regulate pressures within the well.

part of a negotiated settlement with Underwriters that covered W&T's interest in numerous oil and gas installments throughout the Gulf of Mexico, including the H-2 Well and H-Platform.

Prime likewise submitted its claim using identical costs and supporting documentation, but it was not paid for its costs incurred in repairing and recompleting the damaged H-2 Well at the same time as W&T. Prime argued that it had submitted its final proof of loss on May 29, 2007. Nevertheless, on August 31, 2007, Underwriters agreed to make a partial payment of $2,820,866 for "actual" well costs, but only if Prime provided the "proper" proof of loss.

Prime became concerned that Underwriters was deliberately not paying its claims. Accordingly, Prime filed its initial lawsuit, *Prime I*, in September 2007, seeking recovery of its unpaid costs, which it alleged totaled approximately $4.7 million.

In December 2007, after *Prime I* was filed, Underwriters made a partial payment of $2,820,866 on what it characterized as Prime's "well claim." The remainder of Prime's claim was still unpaid, however, and the parties disputed whether any additional expenses were covered under the Policy. Eventually, the litigation in *Prime I* focused on platform-related costs and whether the costs incurred beyond the Policy limits of Section IIA (covering expenses related to the platforms and caissons) could be paid under other portions of the Policy.

8

In 2011, the trial court in *Prime I* rendered a declaratory judgment that:

a. Coverage under Section II of the Policy (for Physical Loss and Physical Damage to the H platform) is limited in an amount to the Policy's scheduled limits for platforms/caissons, pipelines and debris removal. Costs incurred by Prime to repair/refurbish the H platform or remove the platform debris in excess of the Policy limits are not covered under Section II.

b. Section IB of the Policy (Expense of Redrilling/Recompleting) does not provide coverage for costs incurred to replace, repair or refurbish the H platform or platform equipment or to remove H platform debris; and

c. Section IA (specifically, the Making Wells Safe Endorsement) does not provide coverage for costs to replace, repair or refurbish the H platform or remove H platform debris.

*Prime I*, 2015 WL 1457534, at *3. This Court affirmed the trial court's *Prime I* judgment as to paragraphs b and c, and Prime did not challenge the declaration of paragraph a. *See id.*

After *Prime I* was resolved, Prime filed the underlying lawsuit. It sought unpaid benefits under Section IA's Making Wells Safe Endorsement and under Section IB for unpaid costs incurred in recompleting and making safe the H-2 Well—an amount Prime alleged was approximately $1.8 million dollars. Prime also alleged that Underwriters committed unfair or deceptive acts or practices in violation of Insurance Code Chapter 541, and that Underwriters owed it statutory prejudgment interest for violations of Insurance Code Chapter 542's Prompt Payment Act in connection with the December 2007 partial payment. Underwriters

9

counterclaimed, asserting that as a result of its $2.7 million partial payment in December 2007, it had overpaid Prime by $1.86 million.

During a lengthy trial, Prime and Underwriters presented numerous witnesses regarding the nature of the damage to the H-2 Well and H-Platform, the nature of the repairs that W&T undertook to restore the Well and Platform, the nature of the coverage included in the Policy, and details of the insurance claims process, including communications, investigation, and payments between Prime and Underwriters. Scott in particular discussed the repairs made to the H-2 Well at length, identifying specific invoices that went unpaid.

The trial court instructed the jury on which types of expenses were covered under various provisions of the Policy. The jury found that Underwriters failed to comply with the Policy and that Prime's resulting damages were $1,820,180.92. The jury further found that Underwriters engaged in various unfair and deceptive practices that resulted in damages to Prime, also in the amount of $1,820,180.92.

The jury also found that Underwriters received notice of Prime's claim on September 29, 2005 and that Underwriters "fail[ed] to request from Prime all items, statements, and forms that Underwriters reasonably believed, at that time, would be required from Prime within 60 days of" September 29, 2005. Finally, the jury found that "Underwriters fail[ed] to unconditionally tender the second partial payment of $2,820,866 to Prime" made in December 2007.

10

The trial court rendered judgment based on the jury's verdict and Prime's election of remedies, as follows:

a. Actual damages of $1,820,180.92 as awarded by the jury;

b. Prejudgment interest on the actual damages, at five percent simple interest per annum, accruing from March 28, 2006, in the amount of $2,706,104.85;

c. Insurance Code [Chapter] 542 Prompt Payment damages, at 18 percent simple interest per annum, accruing from November 26, 2005, in the amount of $9,932,726.87;

d. Additional damages for Underwriters' knowing violations of Texas Insurance Code [Chapter] 541 in the amount of $3,640,361.84; [and]

e. Attorney's fees of $1,463,586.46 as awarded by the jury for the necessary services of Prime's attorneys in the trial court;

The trial court further awarded prejudgment interest on attorney's fees incurred before entry of judgment, conditional appellate attorney's fees, costs, and postjudgment interest on the entire amount of the judgment.

## Additional Policy Benefits

In their first issue, Underwriters argue that Prime's evidence of covered expenses was not based on a correct interpretation of the Policy or of *Prime I* and, therefore, Prime failed to prove that Underwriters owed any additional Policy benefits.

## A. Standards of Review and Relevant Law

This issue encompasses Underwriters' complaint that the trial court misinterpreted the Policy, that stare decisis compels a different interpretation of the Policy than the one used to instruct the jury, and that the charge was erroneous and unsupported by sufficient evidence.

### 1. Interpreting the Policy

We construe insurance policies "using ordinary rules of contract interpretation." *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 257 (Tex. 2017) (per curiam) (quoting *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 831 (Tex. 2009)). When doing so, we must start with the policy's language to determine the parties' intent "as reflected in the terms of the policy itself." *Id.* at 257–58; *see also Prime I*, 2015 WL 1457534, at \*4 (holding that "[t]he rules governing interpretation of contracts, in general, apply to interpreting insurance policies" and that our "primary concern" in construing them "is to give effect to the written expression of the parties' intent") (citing *Gilbert Tex. Constr. L.P. v. Underwriters at Lloyd's, London*, 327 S.W.3d 118, 125 (Tex. 2010), and *Mid-Continent Cas. Co. v. Global Enercom Mgmt., Inc.*, 323 S.W.3d 151, 154 (Tex. 2010)). We review a trial court's construction of an unambiguous contract de novo. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650–51 (Tex. 1999).

We must "examine the entire agreement and seek to harmonize and give effect to all provisions so that none will be meaningless." *Nassar*, 508 S.W.3d at 258 (quoting *Gilbert Tex. Constr.*, 327 S.W.3d at 126); *see Prime I*, 2015 WL 1457534, at *4. No phrase, sentence, or section should be isolated from its setting and considered apart from other contractual provisions. *Id.* (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994)). Unless the policy itself dictates otherwise, we "give words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage." *Id.* (quoting *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015)). When construing an insurance policy, we should read the policy and its endorsements together "unless they are so much in conflict they cannot be reconciled." *TIG Ins. Co. v. N. Am. Van Lines, Inc.*, 170 S.W.3d 264, 271 (Tex. App.—Dallas 2005, no pet.).

We "give policy language its plain, ordinary meaning unless something else in the policy shows the parties intended a different, technical meaning." *Tanner*, 289 S.W.3d at 831; *see Prime I*, 2015 WL 1457534, at *4. If the contract can be given an exact or certain legal interpretation, it is not ambiguous, and we must interpret the insurance policy's meaning and intent from its four corners. *TIG Ins. Co.*, 170 S.W.3d at 268; *see also Prime I*, 2015 WL 1457534, at *4 ("If an insurance policy uses unambiguous language, we must enforce it as written.").

## 2. *Applying Stare Decisis and Law of the Case*

"Generally, the doctrine of stare decisis dictates that once the Supreme Court announces a proposition of law, the decision is considered binding precedent." *Sw. Bell Tel. Co. v. Mitchell*, 276 S.W.3d 443, 447 (Tex. 2008). Stare decisis governs the determination of questions of law and its observance does not depend upon identity of parties. *Swilley v. McCain*, 374 S.W.2d 871, 875 (Tex. 1964). "After a principle, rule or proposition of law has been squarely decided by the Supreme Court, or the highest court of the State having jurisdiction of the particular case, the decision is accepted as a binding precedent by the same court or other courts of lower rank when the very point is again presented in a subsequent suit between different parties." *Id.*

"Considerations in favor of stare decisis are at their acme in cases involving property and contract rights, where reliance interests are involved[.]" *Pearson v. Callahan*, 555 U.S. 223, 233 (2009) (quoting *Payne v. Tennessee*, 501 U.S. 808, 828 (1991)); *see Mitchell*, 276 S.W.3d at 447–48; *see also West Orange-Cove Consol. Indep. Sch. Dist. v. Alanis*, 107 S.W.3d 558, 604 (observing that stare decisis grew out of "the necessity for a uniform and settled rule of property, and definite basis for contracts and business transactions"); *City of San Antonio v. Tenorio*, 543 S.W.3d 772, 799 (Tex. 2018) (Boyd, J., dissenting) ("Stare decisis applies with particular force when the precedent at issue governs land titles,

14

contracts, insurance policies, or common-law rules upon which parties have probably relied in conducting their personal, family, and business affairs.") (internal quotations omitted). The doctrine, however, "is not absolute": "[W]e adhere to our precedents for reasons of efficiency, fairness, and legitimacy," and "when adherence to a judicially-created rule of law no longer furthers these interests, and 'the general interest will suffer less by such departure, than from a strict adherence,' we should not hesitate to depart from a prior holding." *Mitchell*, 276 S.W.3d at 447. "[U]pon no sound principle do we feel at liberty to perpetuate an error, into which either our predecessors or ourselves may have unadvisedly fallen, merely upon the ground of such erroneous decision having been previously rendered." *Id.*

Similar to stare decisis, the law-of-the-case doctrine is the "principle under which questions of law decided on appeal to a court of last resort will govern the case throughout its subsequent stages." *Loram Maint. of Way, Inc. v. Ianni*, 210 S.W.3d 593, 596 (Tex. 2006); *see Entergy Corp. v. Jenkins*, 469 S.W.3d 330, 336 (Tex. App.—Houston [1st Dist.] 2015, pet. denied).

Under the law-of-the-case doctrine, a court of appeals will ordinarily be bound by its initial decision if there is a subsequent appeal in the case. *Briscoe v. Goodmark Corp.*, 102 S.W.3d 714, 716 (Tex. 2003) ("By narrowing the issues in the successive stages of the litigation, the law of the case doctrine is intended to

achieve uniformity of decision as well as judicial economy and efficiency."); *Jenkins*, 469 S.W.3d at 336–37. This doctrine is based on public policy and is aimed at bringing finality to litigation. *Jenkins*, 469 S.W.3d at 337. A decision rendered on an issue by an appellate court does not, however, absolutely bar reconsideration of the issue on a second appeal. *Id.* The doctrine does not necessarily apply when either the issues or the facts presented in successive appeals are not substantially the same as those involved in the first trial. *Id.*

### 3. *Reviewing Charge Error*

The trial court shall submit instructions and definitions as shall be proper to enable the jury to reach a verdict and that are raised by the written pleadings and the evidence. TEX. R. CIV. P. 277, 278.

We review a trial court's decision to submit or refuse a particular instruction under an abuse-of-discretion standard. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006). "One way in which a trial court abuses its discretion is by failing to follow guiding rules and principles." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009) (citing *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998)). In preparing the charge, trial courts have no discretion to misstate the law. *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 525 & n.32 (Tex. 2003).

A judgment will not be reversed for charge error unless the error was harmful because it probably caused the rendition of an improper verdict or probably prevented the petitioner from properly presenting the case to the appellate courts. TEX. R. APP. P. 44.1; *Hawley*, 284 S.W.3d at 856. Charge error is generally considered harmful if it relates to a contested, critical issue. *Hawley*, 284 S.W.3d at 856.

### 4.      *Reviewing Sufficiency of the Evidence*

A legal-sufficiency challenge will be sustained only if: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *City of Keller v. Wilson*, 168 S.W.3d 810, 810, 822 (Tex. 2005). In our review, we are mindful that jurors are the sole judges of the credibility of the witnesses and the weight to be given their testimony. *Id.* at 819. We review the evidence presented at trial in the light most favorable to the jury's verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 770 (Tex. 2010).

**B.     Analysis of Claim for Additional Policy Benefits**

Prime's central claim was that it was owed additional Policy benefits for costs it incurred in making the H-2 Well safe and in redrilling and recompleting the H-2 Well. Prime claimed that it was owed these additional Policy benefits under either the Making Wells Safe Endorsement found in Section IA of the Policy or under the coverage for redrilling and recompletion in Section IB.

### 1.     *Language of the Policy*

Section I of the Policy covers wells, specifically "Control of the Well(s)" and "Redrilling/Recompletion" of the covered well(s). Under the general conditions in Section I of the Policy, in paragraph 16, the Policy describes when coverage attaches and terminates. In this section, the Policy provides that coverage for wells insured "during drilling only" shall terminate "upon either total and/or complete abandonment or completion of such well(s), which shall include the setting of the 'Christmas Tree,' pumping equipment or well head equipment or the dismantling or removal of the drilling equipment from the drill site, or the termination of the Assured's responsibility under contract. . . ."

Section I's Policy limits for Prime's interest in the H-2 Well was $25,000,000 per occurrence.

Section IA contains "Control of Well Insurance" provisions. Under "Coverage," it provides, in relevant part, that Underwriters would reimburse Prime

"for actual costs and/or expenses incurred . . . in regaining control of all well(s) insured hereunder which get out of control" and "for removal of wreckage and/or debris of property of [Prime], owned or leased in whole or in part, resulting from a loss insured [under this section] provided removal and/or destruction is required by a legal or contractual obligation of [Prime]." The Policy further stated that "from any such claim for costs and/or expenses shall be deducted the value of any property salvaged or recovered inuring finally and irrevocably to [Prime's] benefit."

Section IA defined "Well Out of Control":

A well(s) shall be deemed to be out of control when there is a continuous unintended, uncontrolled flow of drilling fluid, oil, gas and/or water from the well, above the surface of the earth and/or waterbottom or when it is declared to be out of control by the appropriate regulatory authority.

Section IA also specifically defined covered expenses and provided for termination of expenses once the well "can be reentered for salvage, fishing or cleaning operations or to resume drilling"; "brought under control above the surface of the ground (or waterbottom in the case of a well located in water)"; "is plugged and abandoned; whichever shall first occur"; or "upon the approval of the appropriate regulatory authority." And Section IA expressly excludes certain costs, including "damage to any part of contractor's drilling rig and equipment, loss or damage to property, . . . and all expense of conditional well(s) to resume drilling operations."

19

Section IA of the Policy further included a "Making Wells Safe Endorsement" that provided as follows:

> In respect of wells insured hereunder and in consideration of payment of an additional premium . . . , Section IA of this Certificate is endorsed to cover reimbursement to the Assured for the actual costs and expenses incurred in preventing the occurrence of a loss insured hereunder when the drilling and/or workover and/or production equipment has been directly lost or damaged by . . . windstorm . . . but only when, in accordance with all regulations, requirements and normal and customary practices in the industry, is it necessary to re-enter the original well(s) in order to continue operations or restore production from or plug and abandon such well(s).
> Underwriters' liability for costs and expenses incurred by reason of this endorsement shall cease at the time that:
> (1) operations or production can be safely resumed, or
> (2) the well is or can be safely plugged and abandoned, whichever shall first occur.

Section IB of the Policy provides additional well coverage, addressing the "Expense of Redrilling/Recompletion." It provides coverage for:

> actual expenses incurred by [Prime] including all in-hole equipment (including casing) owned by the Assured in redrilling, recompletion, washover, fishing and/or any other salvage operations as may be necessary to recover or restore any well which may be lost or damaged as a result of . . . windstorm . . . and which cannot be recovered or restored by means other than redrilling and/or recompletion. Actual expenses for redrilling or recompletion shall be limited to the depth of the well and comparable condition that existed prior to the loss.

Section IB further provides that Underwriters' liability terminates "when a lost or damaged well is restored to the original depth and comparable condition

20

that existed prior to the well becoming out of control, on fire or lost or damaged" as a result of a covered peril, such as a windstorm.

Section IIA of the Policy is referred to as the "London Standard Platform Form." The "Platforms/Caissons" associated with the SS 148 installation was specifically listed on the "Schedule of Property Insured." It insured "against all risks of direct physical loss to the property insured," including loss attributable to windstorm. The "sum insured" of the SS 148 installation was listed in the schedule as $900,000.

Section IIB of the Policy is referred to as the "Pipeline Form." This form insured the enumerated Pipelines/Flowlines, including the "SS148 to SS 149" for up to $200,000.

### 2. Jury Charge and Jury Findings

The trial court instructed the jury as follows:

1. Coverage under Section II of the Policy (for Physical Loss and Physical Damage to the H Platform and removal of the debris of the H platform) is limited in an amount to the Policy's scheduled limits for platforms/caissons, pipelines and debris removal. Costs incurred by Prime to repair/refurbish the H platform or remove the platform debris in excess of the Policy limits are not covered under Section II.

2. Section IB of the Policy (Expense of Redrilling/Recompletion) does not provide coverage for costs incurred to replace, repair or refurbish the H platform or platform equipment or to remove H platform debris.

3. Section IA (specifically, the Making Wells Safe Endorsement) does not provide coverage for costs to replace, repair or refurbish the H platform or remove the H platform debris.

21

4. Section IB of the Policy is not limited to recompletion costs that Prime incurred for work inside the borehole. Section IB of the Policy provides coverage for all recompletion costs, including, but not limited to, repairing and replacing the H2 wellhead, the H2 Christmas tree, and the 30" and 48" inch pipes that supported the H2 wellhead and H2 Christmas tree.

5. The Making Wells Safe Endorsement is not limited to costs that Prime incurred for work inside the borehole to make the well safe. The Making Wells Safe Endorsement provides coverage for the actual costs and expenses that Prime incurred to prevent the occurrence of a continuous, unintended, uncontrolled flow of drilling fluid, oil, gas, and/or water from the H2 well, above or below the surface of the earth and/or water bottom.

The charge then asked the jury generally, "Did Underwriters fail to comply with the Policy." The jury found that it did, awarding Prime $1,820,180.92 as actual damages.

Underwriters challenge jury instruction numbers four and five, which state that coverage under the Making Wells Safe Endorsement of Section IB "is not limited to costs that Prime incurred for work inside the borehole." Underwriters argue that this instruction is contradicted by the Policy terms and this Court's previous interpretation of the Policy in *Prime I*.

### 3. *Instructions on the Policy Language*

Underwriters objected to the instruction that "Section IB of the Policy is not limited to recompletion costs that Prime incurred for work inside the borehole" but also includes "all recompletion costs, including, but not limited to, repairing and replacing the H2 wellhead, the H2 Christmas tree, and the 30" and 48" inch pipes

22

that supported the H2 wellhead and H2 Christmas tree." Underwriters further tendered their own proposed instructions, which were rejected by the trial court. Relevant here, Underwriters sought a jury instruction stating that the term "well" "does not include a production platform or other appurtenances associated with the well itself." Underwriters further sought an instruction that "'Well' means the hole made by the drilling bit, which can be open, cased or both, also called a borehole, hole, or wellbore."

Underwriters further argue that Prime failed to prove that Underwriters owed it additional Policy benefits under the Making Wells Safe endorsement because its evidence was "untethered" from the language of the Policy. Again, we construe this, in part, as an assertion that the jury instruction stating that Making Wells Safe coverage was not limited to costs incurred for work inside the borehole was erroneous.

On appeal, Underwriters argue that *Prime I* held that neither Section IA's Making Wells Safe Endorsement nor Section IB covered costs to restore items outside the borehole and that the trial court failed to provide the jury with a correct interpretation of the Policy. This argument, however, is based on an overly broad reading of *Prime I*. We agree that, under the principles of law of the case and stare decisis, the courts are bound to follow the legal rulings set out in *Prime I*. But

*Prime I* considered a narrow set of legal questions that are distinct in several key ways from the questions at issue in this appeal.

> In *Prime I*, this Court affirmed the trial court's judgment declaring that:
>
> b. Section IB of the Policy (Expense of Redrilling/Recompleting) does not provide coverage for costs incurred to replace, repair or refurbish the H platform or platform equipment or to remove H platform debris; and
>
> c. Section IA (specifically, the Making Wells Safe Endorsement) does not provide coverage for costs to replace, repair or refurbish the H platform or remove H platform debris.

2015 WL 1457534, at *3, 9, 11. In reaching this conclusion, the Court construed various aspects of the Policy.

Regarding Section IB, covering redrilling and recompletion costs, *Prime I* held, "The plain language of Section IB covered expenses incurred in recompletion efforts and salvage operations to restore an insured 'well' that was lost or damaged by specified perils, including windstorm, to its pre-loss condition," and that, although the term "well" was not defined in the Policy:

> it is commonly understood to mean "the hole made by the drilling bit, which can be open, cased or both. Also called borehole, hole, or wellbore." Thus, the term "well" is not commonly understood, in the industry or otherwise, to include a production platform or other "appurtenances" associated with the well itself, as asserted by Prime.

*Id.* at *8 (internal citations omitted). *Prime I* further stated:

> Section IB expressly obligated Underwriters to only "reimburse [Prime] for actual expenses incurred by [Prime] *including all in-hole equipment* (including casing) owned by [Prime]." (Emphasis added).

24

As Underwriters' counsel argued to the trial court, restoring the actual "well" to its comparable, pre-loss condition, simply involved restoring the well's internal components, i.e., the type, kind and location of the casing set, the number of liners, and any sand screens.

*Id. Prime I* further considered definitions for terms like "debris" and "salvage" before concluding that "the trial court did not err in granting summary judgment by declaring that 'Section IB of the Policy (Expense of Redrilling/Recompleting) does not provide coverage for costs incurred to replace, repair or refurbish the [H-Platform] or platform equipment or to remove [H-Platform] debris." *Id.* at *8–9.

Regarding the Making Wells Safe Endorsement, in *Prime I*, Prime attempted to frame the issue broadly, arguing that it presented summary-judgment evidence demonstrating that it had incurred substantial costs to ensure the H-2 Well did not become out of control and, therefore, the trial court erred to the extent it determined Prime did not incur costs covered by Section IA and Making Wells Safe Endorsement. *Id.* at *9. This Court, however, observed that the trial court's judgment "simply and narrowly declared" that "Section IA (specifically, the Making Wells Safe Endorsement) does not provide coverage for costs to replace, repair or refurbish the H-Platform or remove H-Platform debris." *Id.* at *10. Regarding the scope of the issues decided, *Prime I* stated:

Although Prime frames its issue in terms of whether it incurred certain costs, the trial court made no determination, either explicitly or implicitly, as to whether Prime actually incurred such costs. Nor did it make any determination about how Underwriters had classified Prime's costs. As is readily apparent from the express language of the

25

trial court's judgment, it merely declared that *certain specific costs—* described as costs to replace, repair, or refurbish the H-Platform, or remove the H-Platform debris—were not covered under Section IA or the Making Wells Safe Endorsement.

*Id. Prime I* construed that language of Section IA of the Policy and the Making Wells Safe Endorsement, specifically holding:

> [T]he "Making Wells Safe Endorsement," which applied to Section IA, provided Prime additional coverage for "actual costs and expenses" incurred in "preventing" a blowout or well out of control "when the drilling and/or workover and/or production equipment has been directly lost or damaged" by specifically enumerated risks, including windstorm. However, it applied "only when, in accordance with all regulations, requirements and normal and customary practices in the industry, it [was] necessary to reenter the original well(s) in order to continue operations or restore production from or plug and abandon such well(s)." And Underwriters' liability for such costs and expenses incurred by reason of the endorsement ceased at the time that (1) "operations or production [could] be safely resumed" or (2) "the well is or [could] be safely plugged and abandoned," whichever occurred first.

*Id. Prime I* further observed that Prime did not direct the Court "to any summary-judgment evidence demonstrating that the H-Platform's replacement, repair, or refurbishment, or the removal of the H-Platform's debris was necessary to prevent the H-2 Well from blowing out or becoming out of control." *Id.* at *11. Accordingly, *Prime I* concluded:

> Focusing on the actual wording of the trial court's judgment concerning Section IA and the Making Wells Safe Endorsement, we conclude that its declaration is consistent with the express language of the section and the endorsement, especially when read in the context of the entire Policy. Accordingly, we hold that the trial court did not err in declaring that "Section IA (specifically, the Making Wells Safe

26

Endorsement) does not provide coverage for costs to replace, repair or refurbish the H-Platform or remove H-Platform debris."

*Id.*

Notably, the trial court in the underlying proceeding provided jury instructions consistent with the holdings in *Prime I*, informing jurors that:

1. Coverage under Section II of the Policy (for Physical Loss and Physical Damage to the H Platform and removal of the debris of the H platform) is limited in an amount to the Policy's scheduled limits for platforms/caissons, pipelines and debris removal. Costs incurred by Prime to repair/refurbish the H platform or remove the platform debris in excess of the Policy limits are not covered under Section II.

2. Section IB of the Policy (Expense of Redrilling/Recompletion) does not provide coverage for costs incurred to replace, repair or refurbish the H platform or platform equipment or to remove H platform debris.

3. Section IA (specifically, the Making Wells Safe Endorsement) does not provide coverage for costs to replace, repair or refurbish the H platform or remove the H platform debris.

*Prime I*, however, did not address what actions or components would be involved in "recompleting" the covered well or making the well safe, nor did *Prime I* address whether items such as the wellhead, Christmas tree, or conductor casings would be considered part of the H-2 Well or part of the H-Platform.

Because *Prime I* did not provide a thorough construction of what Section IA, the Making Wells Safe Endorsement, or Section IB *do* cover—it held only that they *do not* cover costs incurred to replace, repair, or refurbish the H-platform or remove platform debris—these legal questions were left for further construction. In

27

fact, *Prime I* expressly disclaimed making any determination regarding which expenses might be covered by the various Policy provisions, stating, "The question of whether the costs and expenses actually incurred by Prime can be classified as falling within one or more of these excluded types of costs was not before the trial court and is not before this Court on appeal." *Id.* at *9 n.5.

Looking to the plain language of the Policy itself, there is support for the trial court's further instructions that:

> 4. Section IB of the Policy is not limited to recompletion costs that Prime incurred for work inside the borehole. Section IB of the Policy provides coverage for all recompletion costs, including, but not limited to, repairing and replacing the H2 wellhead, the H2 Christmas tree, and the 30" and 48" inch pipes that supported the H2 wellhead and H2 Christmas tree.

As we held in *Prime I*, "The plain language of Section IB covered expenses incurred in recompletion efforts and salvage operations to restore an insured 'well' that was lost or damaged by specified perils, including windstorm, to its pre-loss condition." *Id.* at *8. Specifically, the Policy provides that

> Underwriters agree . . . to reimburse [Prime] for actual expenses incurred by [Prime] including all in-hole equipment (including casing) owned by [Prime] in redrilling, recompletion, washover, fishing and/or any other salvage operations as may be necessary to recover or restore any well which may be lost or damaged as a result of . . . windstorm . . . and which cannot be recovered or restored by means other than redrilling and/or recompletion. Actual expenses for redrilling or recompletion shall be limited to the depth of the well and comparable condition that existed prior to the loss.

By this plain language, the Policy contemplates more than just redrilling or restoring the borehole—otherwise, the use of the additional term "recompletion" or the explanation "including all in-hole equipment (including casing)" would not have been necessary.

While "recompletion" is not expressly defined in the Policy, the general provisions of Section I include a statement that "completion" of wells insured during drilling only "shall include the setting of the 'Christmas Tree,' pumping equipment or well head equipment or the dismantling or removal of the drilling equipment from the drill site." This explanation of "completion" in the Policy supports a conclusion that "recompletion" likewise includes repeating those same steps. Accordingly, the trial court's instruction on Section IB does not conflict with either *Prime I* or the language of the Policy.

Nor does it appear that instructing the jury, as Underwriters suggest, that "[t]he term 'well' does not include a production platform or other appurtenances associated with the well itself," or that "'[w]ell' means the hole made by the drilling bit, which can be open, cased or both, also called a borehole, hole, or wellbore," would have properly construed Section IB of the Policy or have aided the jury in determining what was meant by "redrilling" or "recompletion" of the covered well. *See* TEX. R. CIV. P. 277; *Hawley*, 284 S.W.3d at 855–56 (holding

29

that for instruction to be proper, it must: (1) assist jury; (2) accurately state law; and (3) find support in pleadings and evidence).

Underwriters argue that the instruction given by the trial court does not comport with the scope of the Making Wells Safe Endorsement. However, the Making Wells Safe Endorsement provides:

> Section IA of this Certificate is endorsed to cover reimbursement to [Prime] for the actual costs and expenses incurred in preventing the occurrence of a loss insured hereunder when the drilling and/or workover and/or production equipment has been directly lost or damaged by . . . windstorm . . . but only when, in accordance with all regulations, requirements and normal and customary practices in the industry, is it necessary to re-enter the original well(s) in order to continue operations or restore production from or plug and abandon such well(s).
>     Underwriters' liability for costs and expenses incurred by reason of this endorsement shall cease at the time that:
>     (1) operations or production can be safely resumed, or
>     (2) the well is or can be safely plugged and abandoned,
>     whichever shall first occur.

Section IA further provides an explanation of the type of occurrence of a loss that is covered by the Making Wells Safe Endorsement by defining "Well Out of Control" as follows:

> A well(s) shall be deemed to be out of control when there is a continuous unintended, uncontrolled flow of drilling fluid, oil, gas and/or water from the well, above the surface of the earth and/or waterbottom or when it is declared to be out of control by the appropriate regulatory authority.

The trial court's instruction comports with the plain language of the Policy, which does not limit costs to those incurred within the borehole itself, but

30

expressly states that it applies when "the drilling and/or workover and/or production equipment has been directly lost or damaged by . . . windstorm." The remainder of the jury instruction given tracks the language of the Policy.

Furthermore, to the extent that Underwriters are attempting to argue that the trial court should have instructed the jury on the Policy provisions that the Making Wells Safe endorsement only applies "when, in accordance with all regulations, requirements and normal and customary practices in the industry, is it necessary to re-enter the original well(s) in order to continue operations or restore production from or plug and abandon such well(s)" or the conditions that resulted in Underwriters' liability ceasing, they did not present alternative jury questions providing any such explanation. And it was reasonable for the trial court to consider the answers to those questions—i.e., whether reentering the well was necessary and when operations or production could safely be resumed or the well could safely be plugged and abandoned—as being fact questions left to the jury's discretion in determining whether Underwriters complied with the Policy.

### 4. *Sufficiency of the Evidence*

Underwriters argue that Prime failed to prove under the correct interpretation of Section IB that Underwriters owed any additional Policy benefits, stating in its reply brief, "*[I]f* the trial court's instructions were correct, there is evidence of damages under Section IB; but . . . if the instructions were wrong, and

31

Section IB covers only the restoration of the well and its internal components, there is no evidence Underwriters failed to pay any covered expenses."

As outlined above, we have already determined that the trial court did not err in instructing the jury. We further conclude that the testimony and other evidence admitted through Prime's expert, Andy Scott, presents legally and factually sufficient evidence that could have been credited by the jury on this question. Scott oversaw the entire repair process on behalf of W&T and was later retained by Prime to investigate and explain the discrepancy between what Underwriters paid W&T and what it paid Prime on identical work and invoices.

Scott provided detailed testimony regarding both general industry practice and the original construction of SS 148 formation, specifically the H-2 Well and H-Platform. Scott testified extensively regarding the damage to the H-2 Well and H-Platform, the danger posed by the severely damaged H-2 Well, and the nature of the repairs that were necessary to restore the H-2 Well and H-Platform.

Scott pointed out that the H-2 Well itself did not have a platform. He also testified that the H-Platform was "just a little simple unmanned production facility and the only thing that's located up here is a test separator" used for conducting government-required testing of the H-2 Well's production. He said that, ordinarily, production from the H-2 Well would flow directly to SS 149, a nearby full production unit.

Scott reviewed the 688 invoices generated in connection with Prime's loss. He opined that Prime incurred costs for recompleting the H-2 Well and for making the Well safe in excess of the $2.7 million that Underwriters had already paid, and, after reviewing the Final Statement of Claim prepared by Craig Nelson at MattDan, Underwriters still owed Prime more than $1.8 million. He identified approximately 221 invoices that Underwriters had not yet paid that were, in whole or in part, incurred for repairs to make the H-2 Well safe and restore it to its pre-loss condition. He presented this evidence to the jury by testimony and in a spreadsheet.

Underwriters further argue that Prime failed to provide evidence supporting any jury finding in its favor under the Making Wells Safe Endorsement, asserting that Prime's proof was "untethered" from the language of Policy. However, Scott testified that, in accordance with industry standards and customs, it was necessary to reenter the H-2 Well to prevent a loss of control of it. He further itemized for the jury the costs that Prime incurred in making the H-2 Well safe. While Underwriters contest Scott's testimony regarding the extent and nature of Prime's loss and provided expert witnesses of their own to contradict Prime's account of the necessary repairs, the jury was entitled to disbelieve Underwriters' evidence, to believe Prime's expert, and to credit Prime's evidence. *See Wilson*, 168 S.W.3d at 819 (we must be mindful that jurors are sole judges of witnesses' credibility and

33

weight to be given their testimony); *Del Lago Partners*, 307 S.W.3d at 770 (we review evidence in light most favorable to jury's verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not).

We overrule Underwriters' first issue.[2]

## Insurance Code Ch. 541 Findings

In their second issue, Underwriters argue that Prime failed to establish its entitlement to damages under Insurance Code Chapter 541 for Underwriters' alleged unfair or deceptive acts or practices.

## A.     Law Governing Chapter 541

The Texas Insurance Code authorizes a private action against an insurer that commits "an unfair or deceptive act or practice in the business of insurance." TEX.

---

[2] Underwriters make a *Casteel* argument, asserting that we must reverse if the instructions for either Section IB or the Making Wells Safe endorsement were erroneous. Underwriters also argue that, because the charge erroneously expanded the Policy's coverage, Prime failed to properly segregate covered and non-covered repairs. We have concluded, however, that there was no error in the charge regarding either Policy provision. *See, e.g.*, *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 389 (Tex. 2000) ("When a single broad-form liability question erroneously commingles valid and invalid liability theories and the appellant's objection is timely and specific, the error is harmful when it cannot be determined whether the improperly submitted theories formed the sole basis for the jury's finding."); *Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co.*, 130 S.W.3d 181, 198 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("[W]hen covered and non-covered perils combine to create a loss, the insured is entitled to recover that portion of the damage caused solely by the covered peril," and "the burden of segregating the damage attributable solely to the covered event is a coverage issue for which the insured carries the burden of proof"). As discussed above, Prime provided evidence of its covered losses that the jury was entitled to credit.

INS. CODE § 541.151; *Barbara Techs. Corp. v. State Farm Lloyds*, No. 17-0640, 2019 WL 2710089, at \*14 (Tex. June 28, 2019); *see also* TEX. INS. CODE § 541.152 (providing that prevailing plaintiff may obtain actual damages plus court costs and reasonable attorney's fees, and, when complained-of act was done knowingly, may be awarded up to three times amount of actual damages); *Ortiz v. State Farm Lloyds*, No. 17-1048, 2019 WL 2710032, at \*5 (Tex. June 28, 2019). If an insurer fails to pay the full amount of the claim as a result of an unfair claim-settlement practice under the Insurance Code, the insured may elect to recover its damages under either a breach-of-contract or a statutory-violation theory. *Waite Hill Servs, Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 185 (Tex. 1998); *USAA Tex. Lloyd's Co. v. Griffith*, No. 13-17-00337-CV, 2019 WL 2611015, at \*8 (Tex. App.—Corpus Christi–Edinburg June 26, 2019, no pet.) (mem. op.); *see Barbara Techs.*, 2019 WL 2710089, at \*14.

Prime alleged that Underwriters engaged in various statutorily prohibited unfair settlement practices, including refusing to pay Prime's claim without conducting a reasonable investigation of the claim, failing to affirm or deny the claim within a reasonable time, failing to provide a prompt explanation for the basis of the denial, misrepresenting the coverage at issue, failing to settle in good faith once its liability had become reasonably clear, and failing to settle in good faith a claim under one portion of the Policy to influence Prime to settle another

35

claim under another portion of the Policy. *See* TEX. INS. CODE § 541.060(a)(1)–(4), (7).

An insured's claim for breach of an insurance contract "is distinct and independent from a claim that an insurer violated the Insurance Code.'" *Barbara Techs.*, 2019 WL 2710089, at \*14 (quoting *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 489 (Tex. 2018)). In *Ortiz*, the supreme court clarified that "although a breach of contract finding is not a prerequisite to recovery for a statutory violation that 'caused' the insured's damages, the 'general rule' is that 'an insured cannot recover policy benefits as actual damages for an insurer's statutory violation if the insured has no right to those benefits under the policy." 2019 WL 2710032, at \*5 (quoting *Menchaca*, 545 S.W.3d at 495). The corollary to this rule is that "an insured who establishes a right to benefits under the policy can recover those benefits as actual damages resulting from a statutory violation." *Id.*; *see also Menchaca*, 545 S.W.3d at 496 ("If an insurer's wrongful denial of a valid claim for benefits results from or constitutes a statutory violation, the resulting damages will necessarily include 'at least the amount of policy benefits wrongfully withheld.'"). "And regardless of whether an insured is entitled to benefits under the policy, he may recover damages for a statutory violation that causes an injury 'independent from the loss of the benefits.'" *Ortiz*, 2019 WL 2710032, at \*5.

An insurer does not breach its common law duty of good faith merely by erroneously denying a claim. *Griffith*, 2019 WL 2611015, at *8 (citing *US Fire Ins. Co. v. Williams*, 955 S.W.2d 267, 268 (Tex. 1997) (per curiam)). Nor does evidence showing only a bona fide coverage dispute, by itself, demonstrate bad faith. *Id.*; *see Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 67 (Tex. 1997) ("[A] simple disagreement among experts about whether the cause of the loss is one covered by the policy will not support a judgment for bad faith.").

On the other hand, an insurer's reliance on an expert report, standing alone, will not necessarily shield the insurer if there is evidence that the report was not objectively prepared or the insurer's reliance on the report was unreasonable. *Griffith*, 2019 WL 2611015, at *8 (citing *State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 448 (Tex. 1997)). Whether an insurer acted in bad faith because it denied or delayed payment of a claim after its liability became reasonably clear is a question for the fact-finder. *Giles*, 950 S.W.2d at 56; *Pena v. State Farm Lloyds*, 980 S.W.2d 949, 955 (Tex. App.—Corpus Christi–Edinburg 1998, no pet.).

## B.    Relevant Jury Findings

The jury found that Underwriters engaged in the following unfair or deceptive acts that caused damage to Prime:

(1) Refusing to pay Prime's claim without conducting a reasonable investigation of the claim;

37

(2) Failing to affirm or deny coverage of Prime's claim within a reasonable time;

(3) Failing to promptly provide Prime a reasonable explanation of the factual and legal basis in the policy for Underwriters' denial of the claim;

(4) Misrepresenting to [Prime] a material fact or policy provision relating to the coverage at issue;

(5) Failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of Prime's claim when Underwriters' liability had become reasonably clear; [and]

(6) Failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim under one portion of a policy, for which Underwriters' liability had become reasonably clear, to influence Prime to settle another claim under another portion of the coverage.

For each of these enumerated unfair or deceptive acts, the jury determined that Prime's damages were $1,820,180.92—the amount of additional Policy benefits to which Prime was entitled.

The jury also found that Underwriters engaged in the conduct enumerated in numbers (2) through (6) knowingly. The jury determined that Prime was entitled to $5,460,542.76 in additional damages because of the knowing conduct, and the trial court reduced that award to the statutory maximum of $3,640,361.84.

## C. Actual Damages

Underwriters first argue, relying on *Menchaca*, that an insurer does not violate Chapter 541 by failing to pay the benefits unless an insured is entitled to

38

benefits under the Policy. *See Menchaca*, 545 S.W.3d at 494–95; *see also Ortiz*, 2019 WL 2710032, at *5 ("[A]lthough a breach of contract finding is not a prerequisite to recovery for a statutory violation that 'caused' the insured's damages, the 'general rule' is that 'an insured cannot recover policy benefits as actual damages for an insurer's statutory violation if the insured has no right to those benefits under the policy.'"). Underwriters argue, "Accordingly, if Prime is not entitled to additional policy benefits, it is not entitled to any recovery under Chapter 541," and they argue that "Prime presented no evidence of damages other than the failure to pay additional policy benefits." Because we have already held that the jury did not err in finding that Prime was entitled to additional benefits under the Policy, we reject this argument. *See Ortiz*, 2019 WL 2710032, at *5, *Menchaca*, 545 S.W.3d at 494–95.

Underwriters also argue that Prime presented no evidence that any of the alleged Chapter 541 violations caused the denial of the disputed Policy benefits. Prime relies on *Menchaca's* statement that "an insurer's statutory violation permits an insured to receive only those 'actual damages' that are 'caused by' the violation," 545 S.W.3d at 495, in arguing that "[t]he difference between the amount Underwriters paid [in its partial payments] and the amount Prime sought at trial was not caused by any of the statutory violations found by the jury." Rather, Underwriters argue that the unpaid amounts were the subject of "the dispute

39

between Underwriters and Prime about differing policy interpretations." This argument, however, does not undermine the causation of actual damages.

The existence of a bona fide coverage dispute does not excuse Underwriters' failure to, for example, conduct a reasonable investigation of Prime's claim or to promptly provide Prime a reasonable explanation of the factual and legal basis in the Policy for Underwriters' denial. The jury found that Underwriters engaged in this unfair or deceptive conduct, and it found that Prime's damages as a result of these violations was the underpayment of the claim by $1,820,180.92—the amount of additional benefits to which Prime was entitled under the Policy.

In discussing the proof of causation in the context of a statutory violation that resulted in an insured failing to receive benefits the insured was due under its policy, the court in *Menchaca* stated that "what matters for purposes of causation under the statute is whether the insured was entitled to receive benefits under the policy":

> While an insured cannot recover policy benefits for a statutory violation unless the jury finds that the insured had a right to the benefits under the policy, the insured does not *also* have to prevail on a separate breach-of-contract claim based on the insurer's failure to pay those benefits. . . . [I]f the jury finds that the policy entitles the insured to receive the benefits and that the insurer's statutory violation resulted in the insured not receiving those benefits, the insured can recover the benefits as "actual damages . . . caused by" the statutory violation.

545 S.W.3d at 494. The supreme court ultimately concluded, "If an insurer's wrongful denial of a valid claim for benefits result from or constitutes a statutory violation, the resulting damages will necessarily include "at least the amount of policy benefits wrongfully withheld." *Id.* at 496; *see also Vail v. Tex. Farm Bureau Mut. Ins. Co.*, 754 S.W.2d 129, 136 (Tex. 1988) ("[A]n insurer's unfair refusal to pay the insured's claim causes damages as a matter of law in at least the amount of the policy benefits wrongfully withheld.").

The jury found that Underwriters engaged in deceptive or unfair practices or acts and that those acts resulted in Underwriters' failure to pay the full amount owed to Prime under the Policy. As we concluded in connection with Underwriters' first issue, the jury properly found that Prime was entitled to additional benefits under the Policy. Thus, based on the jury's findings that Underwriters' denial of benefits owed under the Policy was wrongful, Prime was entitled to the resulting damages in the amount of the Policy benefits wrongfully withheld. *See Menchaca*, 545 S.W.3d at 496; *Vail*, 754 S.W.2d at 136.

Underwriters further argue that there was legally insufficient evidence of the underlying violations because Underwriters' liability had not become reasonably clear due to the existence of a bona fide coverage dispute. This argument, however, is relevant only to two of the jury's findings: that Underwriters failed "to attempt in good faith to effectuate a prompt, fair, and equitable settlement of Prime's claim

41

when Underwriters' liability had become reasonably clear" and that Underwriters failed "to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim under one portion of a policy, for which Underwriters' liability had become reasonably clear, to influence Prime to settle another claim under another portion of the coverage." Underwriters do not challenge the other four violations found by the jury, namely that Underwriters refused to pay Prime's claim without conducting a reasonable investigation, that Underwriters failed to affirm or deny coverage of the claim within a reasonable time, that Underwriters failed to promptly provide Prime a reasonable explanation for the claim's denial, and that Underwriters misrepresented a material fact or Policy provision relating to the coverage at issue. Any one of these four unchallenged findings supports the award of actual damages under Chapter 541, even if a bona fide coverage dispute existed.

We overrule Underwriter's challenge to actual damages awarded under the jury's Chapter 541findings.

**D.    Treble Damages**

Underwriters also argue in the alternative that, even if Prime were entitled to recover additional Policy benefits, it is not entitled to additional damages under Chapter 541.

42

When an insurer's violations of Chapter 541 cause the denial of benefits, an insured may recover additional damages of up to three times the amount of actual damages when the complained-of act or acts were done knowingly. *See* TEX. INS. CODE § 541.152(b); *Ortiz*, 2019 WL 2710032, at \*5. Thus, the award of statutory treble damages requires more than just a wrongful denial of policy benefits—it requires that the violations were committed knowingly. *See* TEX. INS. CODE § 541.152(b); *cf. Giles*, 950 S.W.2d at 54, 57 (recognizing that, under common law bad-faith tort, "even if an insurer is liable for bad faith, a plaintiff may not recover punitive damages on that basis alone," but may recover additional damages "[o]nly when accompanied by malicious, intentional, fraudulent, or grossly negligent conduct").

The Insurance Code defines "knowingly" as "actual awareness of the falsity, unfairness, or deceptiveness of the act or practice on which a claim for damages under Subchapter D is based." TEX. INS. CODE § 541.002(1); *St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co.*, 974 S.W.2d 51, 53 (Tex. 1998) (per curiam). "Actual awareness may be inferred if objective manifestations indicate that a person acted with actual awareness." TEX. INS. CODE § 541.002(1); *Dal-Worth Tank Co.*, 974 S.W.2d at 53. The Texas Supreme Court has described the type of awareness that will establish this type of "knowing" conduct:

> "Actual awareness" does not mean merely that a person knows what he is doing; rather, it means that a person knows that what he is doing

43

is false, deceptive, or unfair. In other words, a person must think to himself at some point, Yes, I know this is false, deceptive, or unfair to him, but I'm going to do it anyway.

*Dal-Worth Tank Co.*, 974 S.W.2d at 53–54.

Relevant here, Underwriters assert that Prime presented no evidence that Underwriters' conduct was committed knowingly. Underwriters argue that the evidence established instead the existence of a bona fide coverage dispute, and Underwriters argue that, because they had a reasonable basis for denying the disputed portion of Prime's claim, Prime cannot show that Underwriters knew that the denial was false or unfair but did it anyway. *See generally WIlson*, 168 S.W.3d at 810, 822 (courts will sustain no-evidence point when there is no evidence of essential fact or when evidence conclusively established opposite of vital fact).

Underwriters rely on the formulation for determining when liability is reasonably clear set out by the Texas Supreme Court in *Rocor International, Inc. v. National Union Fire Insurance Co.*, 77 S.W.3d 253 (Tex. 2002), in which the court considered this question in the context of an insurer's statutory duty to attempt settlement. The *Rocor* court held that an insurer's liability become reasonably clear and triggers its statutory duty to attempt settlement when (1) the policy covers the claim, (2) the insured's liability is reasonably clear, (3) the claimant has made a proper settlement demand within policy limits, and (4) the demands terms are such that an ordinarily prudent insurer would accept it. 77 S.W.3d at 262; *McDonald v.*

44

*Home State Cty. Mut. Ins. Co.*, No. 01-09-00838-CV, 2011 WL 1103116, at *4 (Tex. App.—Houston [1st Dist.] Mar. 24, 2011, pet. denied) (mem. op.). Although the present case does not involve Underwriters' statutory duty to settle with a third party, we find helpful this formulation of when an insurer's liability is reasonably clear.

Underwriters argue that their liability for the unpaid amounts was not reasonably clear because the proper construction of the Policy and the correct categorization of Prime's various expenses were the subject of an ongoing dispute that ultimately resulted in a declaratory judgment by the trial court in Underwriters' favor in *Prime I*, a subsequent appeal of *Prime I* that was also decided in Underwriters' favor, and the underlying litigation. Underwriters continued to assert in this appeal that the Policy did not cover the additional amounts demanded by Prime, and, although we disagree, we cannot say that this was a patently unreasonable legal position. The evidence indicates that Underwriters denied the portion of Prime's claim that they believed was not covered by the Policy, and, therefore, Underwriters believed that Prime's claims for payment were not within the Policy's limits and Prime's demand was not such that an ordinarily prudent insurer would have accepted it. *See Rocor*, 77 S.W.3d at 262.

In light of the evidence that Underwriters believed that the Policy did not cover the disputed amounts, and the fact that Underwriters did in fact make two partial payments for the non-contested amounts, including a payment of the Policy limits for damage to the H-Platform and more than two millions dollars toward the H-2 Well expenses, we cannot conclude that Prime established that Underwriters acted with "actual awareness of the falsity, unfairness, or deceptiveness of the act or practice on which a claim for damages under Subchapter D is based." *See* TEX. INS. CODE § 541.002(1); *Dal-Worth Tank Co.*, 974 S.W.2d at 53–54.

Prime argues that the jury's finding is supported by evidence that, while Underwriters paid the majority of W&T's claim for the same invoices under a substantially similar policy, Underwriters paid roughly half of Prime's claim. Prime also asserts that Underwriters were aware that they were liable to pay the disputed amounts as early as March 30, 2007, when Ammentorp reported to Underwriters that Prime's non-operating interest in the H-2 Well would be affected by W&T's "recent, compromised, 'global' settlement." Ammentorp described the nature of the repairs briefly, stating, "This resulted in the majority of the Ship Shoal [148] expenditures as attributable to the well restoration category." He recommended that Underwriters increase the reserve to pay Prime's remaining claims to $3.1 million "based [in part] upon the settlement of the Operator's [W&T] claim." Ammentorp was subsequently fired and replaced by an executive

with Underwriters who testified that he did not "recall reviewing any invoices at all." He instead relied on the review of the invoices completed by Craig Nelson.

This is insufficient to demonstrate that Underwriters were actually aware of the unfair nature of Prime's treatment. Ammentorp's isolated statement that Prime's interest in the H-2 Well would be affected by W&T's global, negotiated settlement is no evidence that Underwriters affirmatively decided that W&T's claims were covered by W&T's substantially similar policy. Rather, it constitutes evidence that Underwriters' paid W&T's claims as part of a negotiated settlement of many different claims, at least in part for business reasons that were not based on a strict legal interpretation of any insurance policy, and Underwriters' recognition of the fact that the non-operating partner of W&T would be impacted by that settlement. There was no evidence of what portion of W&T's claim for the H-2 Well and H-Platform that Underwriters considered covered by the Policy.

Prime also construes Underwriters' argument that there was a bona fide coverage dispute as "post hoc rationalization." Prime presented evidence that Underwriters denied its claim in October 2007 but then later made the $2.7 million partial payment in December 2007, after Prime had filed suit in *Prime I*, based on an adjustment prepared by MattDan. Prime asserts that, when its claim was denied in October 2007, Underwriters had no valid basis for determining that there was a

coverage dispute and instead withheld payment under the well claims as leverage to force Prime to settle the platform claims in *Prime I*.

We agree with Prime that Underwriters' basis for denying coverage "must be judged by the facts before the insurer at the time it denied the claim." *See Aleman v. Zentih Ins. Co.*, 343 S.W.3d 817, 823–24 (Tex. App.—El Paso 2011, no pet.) (holding same in context of determining whether insurer's liability was reasonably clear) (citing *Viles v. Security Nat'l Ins. Co.*, 788 S.W.2d 566, 567 (Tex. 1990)); *see also Provident Am. Ins. Co. v. Castaneda*, 988 S.W.2d 189, 197 (Tex. 1998) ("[T]he facts existing at the time of denial are dispositive."). We are also mindful, however, that insurers are entitled to rely on reasons for denying a claim that existed at the time the claim was denied, even if those reasons were not originally communicated to the insured as the basis for denial of the claim. *See Castaneda*, 988 S.W.2d at 197 (citing *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 340–41 (Tex. 1995)).

Underwriters paid the Policy limits under the portion of the Policy that covered damages for the H-Platform, and shortly after Prime filed *Prime I*, Underwriters made an additional partial payment for the amounts it believed was due under the Policy for damage to the H-2 Well. This payment two months into the *Prime I* litigation over platform expenses does not support an inference that Underwriters withheld the payment for well expenses to coerce Prime to settle.

And the fact that there were internal conflicts at Underwriters regarding the nature and extent of coverage, or that there were disputes between Prime's and Underwriters' experts regarding the extent of Prime's coverage, demonstrates, at most, that Underwriters were wrong in denying Prime a portion of its Policy benefits. It does not prove that Underwriters were actually aware that denial of a portion of the claim was deceptive or unfair, but chose to do it anyway. *Cf. Giles*, 950 S.W.2d at 67 ("[A] simple disagreement among experts about whether the cause of the loss is one covered by the policy will not support a judgment for [common law] bad faith."); *Griffith*, 2019 WL 2611015, at *8 (evidence showing only bona fide coverage dispute, by itself, is insufficient to demonstrate bad faith).

Finally, Prime points to evidence that Underwriters did not make a good-faith effort to objectively investigate Prime's claim. Prime presented evidence that the adjusters used by MattDan, including Craig Nelson, were unqualified and made numerous errors that Underwriters relied upon. *See Griffith*, 2019 WL 2611015, at *8 (holding that insurer's reliance on expert report, standing alone, will not necessarily shield carrier if there is evidence that report was not objectively prepared or insurer's reliance on report was unreasonable) (citing *Nicolau*, 951 S.W.2d at 448). Again, although this evidence could properly be credited by the jury as proof of a mismanaged investigation or even a negligent one, it does not rise to the level of supporting an inference that Underwriters acted knowingly as

49

set out under the statute. *See Dal-Worth Tank Co.*, 974 S.W.2d at 54–55 (concluding that there was evidence that St. Paul acted negligently and in violation of statute, but no evidence that St. Paul was actually aware its actions toward Dal-Worth were false, deceptive, or unfair).

Reviewing the evidence in the light most favorable to the jury's verdict, we nevertheless conclude that there was no evidence that a jury could reasonably credit to support an inference that Underwriters acted knowingly in light the ongoing coverage dispute. *See Del Lago Partners*, 307 S.W.3d at 770 (we review evidence in light most favorable to jury's verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not); *Rocor*, 77 S.W.3d at 262 (discussing method for evaluating when insurer's liability is reasonably clear).

We sustain Underwriters' second issue as to the jury's finding that the violations of Chapter 541 were done knowingly and reverse the portion of the trial court's judgment awarding treble damages.

**Prompt Payment Act Interest and Prejudgment Interest**

In their third issue, Underwriters argue that the trial court erred in awarding Prime interest under Insurance Code Chapter 542 and in awarding prejudgment interest. It argues, "Prime's calculation of its proposed judgment, which the trial court signed without modification, shows both Chapter 542 and prejudgment

interest were calculated, not only on actual damages, but on the amounts of Underwriters' prior payments to Prime in 2006 and 2007."

## A. Law Governing Chapter 542

The Texas Prompt Payment Claims Act (TPPCA), codified in Insurance Code Chapter 542, imposes procedural requirements and deadlines on insurance companies to promote the prompt payment of insurance claims. *See* TEX. INS. CODE §§ 542.051–.061; *see also id.* § 542.054 ("This subchapter shall be liberally construed to promote the prompt payment of insurance claims."). "Though the TPPCA's purpose relates specifically to prompt payment of claims, the TPPCA also contains specific requirements and deadlines for responding to, investigating, and evaluating insurance claims." *Barbara Techs.*, 2019 WL 2710089, at *3 (citing TEX. INS. CODE §§ 542.055–.056). "Both the payment deadlines and the non-payment deadlines and requirements are enforceable under the TPPCA, and damages can be imposed for any violation." *Id.* (citing TEX. INS. CODE §§ 542.058, .060).

The supreme court summarized the TTPCA as follows:

Taken together, the TPPCA imposes several key requirements on insurers: (1) the insurer must acknowledge receipt of the claim, commence any investigation of the claim, and request any items, statements, or forms required from the claimant within fifteen days of its receipt of notice of the claim; (2) the insurer must notify the claimant of acceptance or rejection of the claim no later than fifteen business days after the insurer receives all items, statements, and forms required to secure final proof of loss; (3) if the insurer notifies

51

the insured that it will pay all or part of the claim, it must pay it by the fifth business day after the date of notice of acceptance of the claim; (4) if the insurer delays payment of a claim for more than the applicable statutory period or sixty days, the insurer shall pay TPPCA damages; and (5) an insurer that is liable for a claim under an insurance policy and violates a TPPCA provision is liable for TPPCA damages in the form of 18% interest on the amount of the claim per year, with attorney's fees. *See* TEX. INS. CODE §§ 542.055(a)(1)–(3), .056(a), .057(a), .058(a), 060(a). Thus, the TPPCA has three main components—non-payment requirements and deadlines, deadlines for paying claims, and enforcement. *See generally id.* §§ 542.055–.060.

*Id.* at *4.

In *Republic Underwriters Insurance Co. v. Mex-Tex, Inc.*, the supreme court construed the predecessor statute to Chapter 542 and concluded that the TPPCA penalty interest should be assessed "if an insurer's tender of partial payment of a claim is not unconditional." 150 S.W.3d 423, 426 (Tex. 2004).

Generally speaking, a "[v]alid tender is an unconditional offer of and actual production of funds by a debtor to pay a sum not less than the amount due on a debt or obligation." *Anglo-Dutch Petrol. Int'l, Inc. v. Greenberg Peden, P.C.*, 522 S.W.3d 471, 489 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (citing *Baucum v. Great Am. Ins. Co.*, 370 S.W.2d 863, 866 (Tex. 1963), and *Bray v. Cadle Co.*, 880 S.W.2d 813, 818 (Tex. App.—Houston [14th Dist.] 1994, writ denied)). A tender must be unconditional to defeat a claim for interest on the obligation accruing after the date of the tender, and the party asserting a valid tender has the burden of proving it. *Id.* "The effect of tender of the amount owed is

that it stops the accrual of interest on the debt." *Id.* (quoting *Bray*, 880 S.W.2d at 818). A tender "that requires the creditor to release its claims against the debtor, to give up a legal right, or to otherwise perform an act that the debtor has no right to demand is conditional and does not constitute a valid tender." *Note Inv. Grp., Inc. v. Assocs. First Capital Corp.*, 476 S.W.3d 463, 488 (Tex. App.—Beaumont 2015, no pet.).

## B.     Analysis

Underwriters assert that the December 2007 partial payment was unconditional. The December 2007 partial payment was not tendered on the condition that Prime give a full release of its claim. No such release or other condition was conveyed with the tender at the time it was made. To the contrary, the tender was accompanied by a notice that the payment was "partial," written recognition that Prime "intends to make additional claims with respect to this loss," and an express statement that "acceptance of this payment is without prejudice to [Prime's] rights to make such further claims." We further observe that the litigation went on for more than a decade after the tender was made by Underwriters and accepted by Prime without Underwriters ever raising the issue that Prime had accepted the 2007 payment as satisfaction of its claim. Furthermore, the evidence at trial established that Underwriters actually produced the funds to Prime and that

Prime accepted and had full use of the funds at the time of tender. *See Anglo-Dutch Petrol.*, 522 S.W.3d at 489.

We conclude, therefore, that Underwriters' tender was unconditional and thereby defeated Prime's claim for interest on the obligation accruing after the date of the tender. *See id.*; *see also Mex-Tex, Inc.*, 150 S.W.3d at 426 (holding that TPPCA penalty interest should be assessed only "if an insurer's tender of partial payment of a claim is not unconditional").

Prime argues that, because Underwriters paid $2.7 million as a partial payment, but then pursued a counterclaim for a large portion of that amount ($1.8 million), the payment was not unconditional. It cites Texas courts that have "found that a debtor who deposits funds into the registry of the court, but who simultaneously files a claim for affirmative relief to recover all or a portion of the deposited funds, does not make an unconditional tender." *Note Inv. Grp., Inc.*, 476 S.W.3d at 488; *see Weisfeld v. Tex. Land Fin. Co.*, 162 S.W.3d 379, 383 (Tex. App.—Dallas 2005, no pet.) (concluding that debtor did not make unconditional tender when it deposited funds into court's registry, but at same time filed counterclaim against creditor for usurious interest and sought to recover portion of deposited funds).

This case is materially distinguishable. There is no evidence that Underwriters' partial tender was not unconditional at the time it was tendered. *See*

54

*Mex-Tex, Inc.*, 150 S.W.3d at 426. Unlike *Weisfeld*, in which the counterclaim was filed at the same time as the purported tender, Underwriters did not file a counterclaim simultaneously with the tender of the December 2007 payment. The counterclaim was not filed until many years later, in 2015, when Prime filed the underlying lawsuit. And we observe that Underwriters made the 2007 payment to Prime, and Prime accepted the funds. This is, again, unlike *Weisfeld* and the other cases relied upon by Prime, in which the "tendered" funds were paid into the registry of the court rather than being made available to the insured. Underwriters' counterclaim filed years after the fact was not a condition on the partial payment, but an attempt to exercise its legal rights in the subsequent litigation.

We conclude that Underwriters provided conclusive proof that the December 2007 tender was unconditional. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (party challenging legal sufficiency of adverse finding on issue on which party bore burden of proof at trial must demonstrate that evidence conclusively established all vital facts in support of issue, as matter of law).

## C. Prejudgment Interest

Underwriters also argue that the trial court erred by awarding prejudgment interest on the December 2007 partial payment for the period after it was made. Underwriters point out that, although the final judgment states that it awarded prejudgment interest only on "actual damages," the amount actually calculated by

55

the trial court necessarily had to include prejudgment interest on the December 2007 partial payment.

Prejudgment interest is awarded to fully compensate the injured party, not to punish the defendant. *Brainard v. Trinity Universal Ins. Co.*, 216 S.W.3d 809, 812 (Tex. 2006). Prejudgment interest is "compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Id.* (internal quotations omitted).

We have already concluded that the December 2007 partial payment was tendered unconditionally. The payment was made to Prime, Prime accepted the payment, and it had the use of the money from the time of the tender. Accordingly, any award of prejudgment interest on the amount of the December 2007 partial payment was erroneous.

We sustain Underwriters' third issue with regard to statutory and prejudgment interest for the December 2007 partial payment.

## Conclusion

We reverse the portion of the trial court's judgment awarding treble damages, i.e. "additional damages for . . . knowing violations of the Texas Insurance Code," and any interest related to that award. We further reverse the portion of the judgment awarding "Insurance Code 542 Prompt Payment damages, at 18 percent simple interest per annum" on the December 2007 partial payment and any related prejudgment interest. We affirm the remainder of the trial court's judgment.

We remand the case to the trial court to allow Prime to make new elections in accordance with our opinion and to recalculate the proper amounts of interest. *See Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex. 1988) (holding that "[a] party may seek recovery under an alternative theory if the judgment is reversed on appeal."); *Jang Won Cho v. Kun Sik Kim*, 572 S.W.3d 783, 816 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (remanding to trial court for recalculation of interest in accordance with opinion).

Richard Hightower
Justice

Panel consists of Justices Kelly, Hightower, and Countiss.